Jessica Taran (SBN 224025)
John Kelley (SBN 194073)
Meha Raja (SBN 330407)
NIESAR & VESTAL LLP
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone: (415) 882-5300
Facsimile: (415) 882-5400

*Attorneys for Plaintiff Coastal Communications Holdings*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

COASTAL COMMUNICATIONS HOLDINGS,

Plaintiff,

vs.

TODD THREW; THE FIRM ADVISORS, LLC; JARED OLSON; CORTNEY SELLS; MAYKAYLA KALAGIAS; and DOES 1 – 10,

Defendants.

Case No. '25CV1102 TWR DEB

**COMPLAINT FOR SECURITIES FRAUD AND UNLICENSED SALE OF SECURITIES; DEMAND FOR JURY TRIAL**

## SUMMARY OF THE ACTION

1. Plaintiff Coastal Communications Holdings ("Plaintiff" or "CCH") brings this action against Todd Threw ("Threw"), The Firm Advisors, LLC ("TFA"), Jared Olson ("Olson"), Cortney Sells ("Sells"), Maykayla Kalagias ("Kalagias"), and Does 1 through 10 (TFA, Threw, Olson, Sells, Kalagias, and Does collectively "Defendants") for violation of the federal and California securities laws and related causes of action in connection with Threw's June 2024 sale to CCH, brokered by TFA, of 100,000 shares (the "Shares") of TJT Communications, Inc. ("TJTC") common stock (the "Transaction").

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over Plaintiff's securities claims under 28 U.S.C. §1331 and under the Securities Exchange Act of 1934, 15 U.S.C. § 78 ("Exchange Act") and the rules and regulations promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

3. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and email.

4. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the claims under the Exchange Act.

5. Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) and (c). A substantial part of the events or acts giving rise to, and in furtherance of, the alleged wrongdoing occurred in this District. Indeed, many of the acts alleged herein, and the acts giving rise to Defendants' misconduct, occurred entirely, or in substantial part, in this District. Venue is also proper in this District pursuant to §27 of the Exchange Act because the acts or transactions constituting the violations occurred in this District.

///

## PARTIES

6. CCH is a Wyoming corporation registered to do business in California. Michael Windsor ("Windsor"), an individual California resident, is CCH's chief executive officer, sole shareholder, and sole director.

7. Defendant Threw is an individual California resident who previously owned TJTC.

8. Defendant TFA is a Nebraska limited liability company with its principal office in Omaha, Nebraska. TFA is not authorized to conduct business in California.

9. Defendant Olson is an individual Nebraska resident, TFA's in-house legal counsel, and an active member of the State Bar of California.

10. Defendant Sells is an individual Nebraska resident and TFA's president.

11. Defendant Kalagias is an individual Nebraska resident and TFA's brokerage principal.

12. Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named as DOES 1 through 10, inclusive, and Plaintiff therefore sues these defendants by their fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names of these DOE defendants when they are identified.

13. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that damages as herein alleged were proximately caused by the acts of such defendants. Wherever the term "Defendants" is used in this complaint, it shall be defined to include the fictitiouslynamed defendants as well. Plaintiff is informed and believes and, upon such information and belief, alleges that each of the Defendants was, at all times herein mentioned, acting in concert with, aiding and abetting, and acting in conspiracy with, each and every one of the remaining Defendants.

///

14. At all relevant times, Defendants, and each of them, were the agents, representatives and/or employees of each other and were acting within the scope and purpose of their agency and employment, and each Defendant has ratified the acts of his, her or its agents, representatives and employees.

**FACTUAL ALLEGATIONS**

15. On April 1, 2024, Windsor saw on the website DealStream.com an advertisement entitled "Site Planning and Survey Firm: Niche in Telecom." Through DealStream.com, Windsor was directed to the TFA website, where he reviewed a listing entitled "*FOR SALE:* Site Planning and Survey Firm: Niche in Telecom with 21 on Staff" (the "Summary," a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference). The Summary identified a business located in San Diego, California, founded in 2008, and priced at $835,000. *Id.*

16. TFA's website repeatedly touted TFA's business prowess and the ways in which TFA was well-positioned to broker business sale transactions. For example, in "Who We Are and What We Do," Sells stated,

> [M]aking the decision to buy or sell a business is always complex and always personal. That's why it helps to have a disciplined partner who can guide you through every step of the process – toward a successful, satisfying outcome. At the Firm Business Brokerage, we have the expertise, resources and successful track record to make your journey toward ownership both enjoyable and rewarding. As an entrepreneur myself, I understand the level of passion, hard work and commitment that goes in to owning a business. And as President, I'll personally see to your needs as we engineer your deal, working with our top-tier team to make sure you receive the personalized attention you deserve.

In "About Us," the TFA website stated, "For the selling client, it is essential that a professional, experienced broker be brought in to provide advice and guidance throughout the process." In "How We Work," the website stated, "The right deal is different for every business, so our team creates compelling Confidential Business Reviews that are tailored to each business and marketed specifically to attract the right buyer." Further, the website stated, "After an offer is accepted, our In-House Legal Counsel works closely with attorneys, CPA's and lending institutions to fine tune deal points over 30 to 60 days. During this time, we coordinate the due diligence, prep for a

successful closing and facilitate a smooth transition." In addition, the website stated, "The Firm Business Brokerage specializes in the sale and purchase of cash-flowing, successful businesses—exactly what buyers and lenders prefer. Anyone thinking about buying or selling a business should work with the brokerage that facilitated [m]ore than 150 closings in 18 industries."

17. After reviewing the Summary and other information contained on TFA's website, Windsor contacted TFA and, after entering into a non-disclosure agreement, received from TFA a more detailed document entitled "Confidential Business Review" (the "Review," a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by this reference). The Review identified the business on sale as Coastal Communications and identified Threw as the business owner, explaining that Threw was "active in the business[,] providing oversight and interfacing with the staff and clients" and sought to "slowly divest" as he "approach[ed] retirement age." *Id.*, Exhibit 2 at 3.

18. Thereafter, TFA served as broker and participated in the negotiations between Windsor and Threw, which resulted in the Transaction.

19. Threw owned the Shares, which constituted all of the outstanding shares of TJTC, which had been doing business as Coastal Communications, primarily in California.

20. On April 12, 2024, Windsor communicated to TFA an offer to purchase the Coastal Communications business from Threw.

21. In May 2024, in anticipation of the Transaction, Windsor formed CCH, a Wyoming corporation with it primary place of business in Carlsbad, California, to serve as purchaser of the Shares.

22. In early June 2024, CCH registered to do business in California.

23. Olson, TFA's in-house counsel and a member of the State Bar of California since October 2021, facilitated the negotiations between Threw and Windsor and, together with Threw, drafted the documentation employed to complete the Transaction, including a Stock Purchase Agreement (the "Agreement"), which called for CCH to pay Threw $835,000 for the Shares.

24. In multiple interactions with him prior to the close of escrow, Threw and TFA repeatedly reassured Windsor that the representations set forth in the Summary and the Review were accurate, and that Coastal Communications was a great business.

25. During negotiation of the Transaction, Windsor believed that TFA was legally authorized to do business in California, in light of the facts that Threw, TJTC, the subject business, and Windsor were all located in California and TFA's in-house counsel Olson was admitted to practice law in the State.

26. Threw and Windsor executed the Agreement effective June 7, 2024.

27. Plaintiff is informed and believes, and thereupon alleges, that Threw paid TFA a substantial fee (consisting of a percentage of the sale price) for brokering the Transaction.

28. The Summary and the Review—both prepared by TFA with input from Threw—contained material misrepresentations regarding the financial condition of TJTC's business.

29. The Summary contained a number of statements of material fact, including the following:

a. The seller training period was one (1) year;
b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment; and
c. The business included a tenured team of twenty-one (21) employees.

30. Similarly, the Review contained a number of statements of material fact, including the following:

a. The seller training period was one (1) year;
b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment;
c. The business included a tenured team of twenty-one (21) employees;
d. The business's primary website domain was "under construction" and would have a new appearance in the coming months;
e. Threw's reason for selling the business was his desire to retire;

f. Threw's primary reason for exiting the business was that he had grandchildren that were growing up too fast, such that he wanted to take a step back and travel with his family;

g. Threw would stay with the business for six months after the closing, in order to provide a seamless transition of client relations and operations;

h. The business did not have any previous or pending lawsuits or other legal matters of which a new owner should be aware;

i. "Coastal Communications," the name of the business, was responsible for generating sales, notwithstanding that Threw had a good reputation based on years of experience in the industry;

j. Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base;

k. Threw's wife's role—handling billing, payroll, and accounting—was not a very active role, perhaps amounting to ten hours per month;

l. Any of the three managers could step up to take on Threw's responsibilities, since each managed his/her own projects;

m. HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, and Wyyerd were notable clients;

n. Only one client had discontinued Coastal Communications's services;

o. New or repeat clients usually approached Coastal Communications with business, rather than Coastal Communications seeking out clients;

p. Coastal Communications did not have a slower season throughout the holidays; and

q. Coastal Communications' recent hiring of new employees was the result of previous employees' moves further from the office and/or desire to continue working from home.

31. In January 2024, Threw's wife Jeanine sent Windsor a final balance sheet (the "Balance Sheet"), which overstated the value of the business's assets (as of December 31, 2023) by over $30,000.

32. On June 17, 2024, Threw sent CCH a letter (the "June Letter") setting forth the status of several signed Coastal Communications projects. A true and correct copy of the June Letter is attached hereto as Exhibit 3 and incorporated herein by this reference. The June Letter stated:

a. Coastal Communications expected to receive a purchase order from Advantage Engineering AT&T in July 2024 for 17 small cell designs;

b. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle T-Mobile Small Cell in July 2024 for over 100 designs; and

c. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle Verizon Small Cell in September 2024 for over 100 designs.

33. The Transaction closed on June 21, 2024.

34. The representations set forth in the Summary, the Review, the Balance Sheet, and the June Letter, identified in paragraphs 29-32, above, were untrue. The true facts were:

a. Threw only wanted to stay on for three months after the Transaction, then become a paid consultant to manage business relationships he no longer owned;

b. A 171% return on an investment of $83,500 in the first year could not be accomplished, given the multiple material misrepresentations in the Summary, Review, Balance Sheet and June Letter;

c. Nine critical employees listed in the Review had left their Coastal Communications employment by the close of escrow;

d. Employee Steve Robison, who brought no value to the business and was very disruptive with other employees, should have been terminated by Threw before the close of the Transaction;

e. Threw did not revise and improve the Coastal Communications website, as represented in the Review, prior to the closing;

f. Threw's actual reason for selling Coastal Communications was that it was not financially viable.

35. On June 17, 2024, days before the closing, Threw emailed Sells: "I probably need to have a meeting with Michael [Windsor] to share that work has significantly slowed over the past 4 weeks due to it being an election year, interest rates for construction and now the lay offs by one of our biggest clients. . . . Not a good time at the moment." Threw did not share this information with Windsor.

36. In addition, on June 18, 2024, Threw emailed Nick Patrick, one of CCH's vendors, "Boy, it has slowed down for us the past month." Threw did not inform Windsor of this business slow down.

37. Windsor would not have caused CCH to enter into the Transaction had he known the true state of the Coastal Communications business.

38. CCH has discovered records of a personal injury lawsuit filed against TJTC by Alejandra Martinez and Ubaldo Marquez, which was concluded by way of settlement. A request for dismissal was filed on April 17, 2023, in the Superior Court of California, County of Los Angeles. The terms of the settlement required Ubaldo Marquez to sign a release of all claims in TJTC's favor and file a dismissal of the lawsuit against TJTC. In return, State Farm had to pay $350,000 as to Mr. Ubaldo Marquez. This settlement has increased the auto insurance premiums CCH is currently required to pay on vehicles previously owned by TJTC.

39. Threw was the key in bringing business prior to the Transaction. CCH possesses email messages sent by Threw prior to closing of the Transaction, seeking business.

40. According to Jeannine Threw, management of the billing, payroll, and accounting aspects of Coastal Communications's business constitutes a very active role. Those functions currently require at least forty hours per month.

41. None of the three managers could or can run the business.

42. The list of Coastal Communications clients provided by Threw to Windsor prior to the closing of the Transaction was not accurate. At the time of the closing, Coastal Communications did not have AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Vinculums, Mobilitie, or Extenet as clients.

43. In contrast to Threw's representation to Windsor that Coastal Communications had lost only one client in five years, Coastal Communications had lost a majority of the clients listed in the Review at the time of the closing of the Transaction.

44. Contrary to the representation in the Review, Coastal Communications had poor results during the November/December 2024 holiday season. Moreover, November and December have been historically slow for Coastal Communications.

45. Contrary to the statements in the Review, Coastal Communications hired new employees prior to the Transaction because more tenured employees had resigned due to poor company culture and compensation.

46. The representation in the Review that a buyer would earn a 171% return on an $83,500 investment in the first year was an arbitrary statement with no basis in fact.

47. The customer purchase orders referenced in the June Letter did not exist. On or about August 8, 2024, Windsor learned from Crown Castle that there were no such projects on the horizon. These projects, which aggregated $437,000, were key factors in Windsor's final decision to acquire Coastal Communications by purchasing the Shares. Windsor would not have proceeded with the Transaction had he known that the orders referenced in the June Letter did not exist.

48. Based on subsequent review, the numbers set forth in the Balance Sheet were outdated at the time the Balance Sheet was provided to Windsor. The correct figure should have been approximately $30,000 lower.

49. The misrepresentations set forth in paragraphs 30 to 32 above induced Windsor to cause CCH to proceed with the Transaction. Windsor thought, based on these multiple material misrepresentations, that Coastal Communications was in a solid financial position, growing and profitable.

50. Had the Summary, the Review, the Balance Sheet, and the June Letter contained accurate representations regarding the business, Windsor would not have caused CCH to enter into the Transaction on the terms ultimately set forth in the Agreement.

51. During negotiation of the Transaction, TFA was a foreign entity unregistered in California and therefore unauthorized to conduct business in the State. As of the filing of this action, TFA remains unregistered and therefore ineligible to conduct business in California.

52. Similarly, during negotiation of the Transaction and continuing to the present, TFA was not licensed to broker the purchase or sale of securities in California, nor was TFA authorized to broker the sale of a business in California.

53. After the close of escrow, Windsor discovered that Coastal Communications was not financially viable.

54. From the closing of the Transaction to date, CCH has incurred at least $435,000 in unanticipated expenditures related to the dire state of the Coastal Communications business.

55. Moreover, due to financial stresses and the need for Windsor to spend countless hours performing management and marketing tasks that were represented to be fully covered by personnel that had left Coastal Communications before the closing of the Transaction, Windsor has been unable to (1) take compensation for his personal services in an amount even remotely approaching the fair value of those services and/or (2) pursue other business ventures.

///

**FIRST CAUSE OF ACTION**

**(Violations of Section 10(b) of the Exchange Act and SEC Rule l0b-5 (Securities Fraud)**

**(Against All Defendants)**

56. Plaintiff incorporates herein by reference paragraphs 1 through 55 of this Complaint, as if restated in their entirety.

57. Plaintiff is informed and believes, and upon that basis alleges, that by using means or instrumentalities of interstate commerce or of the mails, Defendants made material misrepresentations and/or omitted material facts necessary to make their statements not misleading, including, but not limited to, the following:

**Misrepresentations in the Summary**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment; and

c. The business included a tenured team of twenty-one (21) employees.

**Misrepresentations in the Review**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment;

c. The business included a tenured team of twenty-one (21) employees;

d. The business's primary website domain was "under construction" and would have a new appearance in the coming months;

e. Threw's reason for selling the business was his desire to retire;

f. Threw's primary reason for exiting the business was that he had grandchildren that were growing up too fast, such that he wanted to take a step back and travel with his family;

g. Threw would stay with the business for six months after the closing, in order to provide a seamless transition of client relations and operations;

h. The business did not have any previous or pending lawsuits or other legal matters of which a new owner should be aware;

i. "Coastal Communications," the name of the business, was responsible for generating sales, notwithstanding that Threw had a good reputation based on years of experience in the industry;

j. Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base;

k. Threw's wife's role—handling billing, payroll, and accounting—was not a very active role, perhaps amounting to ten hours per month;

l. Any of the three managers could step up to take on Threw's responsibilities, since each managed his/her own projects;

m. HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, and Wyyerd were notable clients;

n. Only one client had discontinued Coastal Communications's services;

o. New or repeat clients usually approached Coastal Communications with business, rather than Coastal Communications seeking out clients;

p. Coastal Communications did not have a slower season throughout the holidays; and

q. Coastal Communications' recent hiring of new employees was the result of previous employees' moves further from the office and/or desire to continue working from home.

**Misrepresentation in the Balance Sheet**

r. As of December 31, 2023, the value of the total assets of Coastal Communications was approximately $30,000 higher than the true value of such assets, according to QuickBooks Online.

///

**Misrepresentations in the June Letter**

s. Coastal Communications expected to receive a purchase order from Advantage Engineering AT&T in July 2024 for 17 small cell designs;

t. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle T-Mobile Small Cell in July 2024 for over 100 designs; and

u. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle Verizon Small Cell in September 2024 for over 100 designs.

58. Defendants made the foregoing material misrepresentations, omissions, and/or false promises in connection with the sale of securities to Plaintiff, or an agreement to sell securities to Plaintiff, and induced Plaintiff to pay $835,000 for the purchase of the Shares.

59. At the time Defendants made the forgoing material misrepresentations, omissions, and/or false promises, Defendants knew them to be false, or recklessly disregarded their falsity, and made them with the intention of inducting Plaintiff to purchase the Shares.

60. Plaintiff justifiably relied upon Defendants' material misrepresentations, omissions, and/or false promises when it purchased the Shares for $ 835,000.

61. Defendants' conduct as described above amounts to violations of Section 10(b) of the Exchange Act and Rule l0b-5 thereunder.

62. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

///

**SECOND CAUSE OF ACTION**

**(Violations of Section 20(a) of the Exchange Act (Control Person Liability)**

**(Against Threw)**

63. Plaintiff incorporates herein by reference paragraphs 1 through 55 of this Complaint, as if restated in their entirety.

64. As alleged herein, Threw violated Section 10(b) of the Exchange Act and Rule l0b-5 thereunder by making untrue statements of material fact and/or omitting material facts necessary to make statements made not misleading, with scienter, in connection with the sale of securities or an agreement to sell securities, upon which Plaintiff reasonably relied, causing Plaintiff economic loss.

65. Threw had control over TJTC within the meaning of Section 20(a) of the Exchange Act. Further, Plaintiff is informed and believes that Threw had a significant equity interest in TJTC. As such Threw had the power to influence TJTC and exercised that power by controlling its strategy and activities. Threw was aware of the false and misleading statements made to Plaintiff as alleged herein. Specifically, as set forth above in paragraphs 35 through 36, Threw was aware of the sharp downturn in the Coastal Communications business before the Transaction closed.

66. Threw was a culpable participant in the fraud perpetuated by Defendants, as evidenced by the numerous oral and written communications to Plaintiff that contained untrue statements of material fact and omissions that made what was said misleading, with the intention of inducing Plaintiff to purchase the Shares.

67. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Threw for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## THIRD CAUSE OF ACTION

## (Securities Fraud pursuant to Cal. Corp. Code §§ 25401 and 25501)

## (Against All Defendants)

68. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

69. Threw sold Plaintiff shares of TJTC, which are securities under California law. (Cal. Corp. Code §25019.)

70. The Documents contained untrue statements of material fact and/or omitted or failed to state material facts necessary in order to make the Documents, in light of the circumstances under which the statements contained therein were made, not misleading, as follows:

**Misrepresentations in the Summary**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment; and

c. The business included a tenured team of twenty-one (21) employees.

**Misrepresentations in the Review**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment;

c. The business included a tenured team of twenty-one (21) employees;

d. The business's primary website domain was "under construction" and would have a new appearance in the coming months;

e. Threw's reason for selling the business was his desire to retire;

f. Threw's primary reason for exiting the business was that he had grandchildren that were growing up too fast, such that he wanted to take a step back and travel with his family;

g. Threw would stay with the business for six months after the closing, in order to provide a seamless transition of client relations and operations;

h. The business did not have any previous or pending lawsuits or other legal matters of which a new owner should be aware;

i. "Coastal Communications," the name of the business, was responsible for generating sales, notwithstanding that Threw had a good reputation based on years of experience in the industry;

j. Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base;

k. Threw's wife's role—handling billing, payroll, and accounting—was not a very active role, perhaps amounting to ten hours per month;

l. Any of the three managers could step up to take on Threw's responsibilities, since each managed his/her own projects;

m. HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, and Wyyerd were notable clients;

n. Only one client had discontinued Coastal Communications's services;

o. New or repeat clients usually approached Coastal Communications with business, rather than Coastal Communications seeking out clients;

p. Coastal Communications did not have a slower season throughout the holidays; and

**q.** Coastal Communications' recent hiring of new employees was the result of previous employees' moves further from the office and/or desire to continue working from home.

**Misrepresentation in the Balance Sheet**

r. As of December 31, 2023, the value of the total assets of Coastal Communications was approximately $30,000 higher than the true value of such assets, according to QuickBooks Online.

**Misrepresentations in the June Letter**

s. Coastal Communications expected to receive a purchase order from Advantage Engineering AT&T in July 2024 for 17 small cell designs;

t. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle T-Mobile Small Cell in July 2024 for over 100 designs; and

u. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle Verizon Small Cell in September 2024 for over 100 designs.

71. As set forth above, Threw and the other Defendants made the Misrepresentations knowing they contained untrue statements of material fact and omitted or failed to state material facts.

72. Threw and the other Defendants offered and sold TJTC securities to CCH in violation of California Corporations Code section 25401.

73. Had the Documents contained true and complete statements of material fact, and not failed to state information necessary to make the statements accurate instead of misleading, CCH would not have agreed to purchase TJTC securities.

74. Likewise, had Threw and the other Defendants provided CCH with all of the material information CCH should have received regarding the TJTC securities, CCH would not have purchased those securities.

75. TFA materially and knowingly aided in the acts underlying the negotiation, preparation and execution of the offer and sale of the TJTC securities to CCH.

76. CCH is informed and believe that the TJTC securities it purchased are presently worth no more than $477,000.

77. TFA and the other Defendants are jointly and severally liable with Threw to Plaintiffs. (Cal. Corp. Code §25504.1.) Defendants TFA, Sells, Olson, and Kalagias materially assisted Threw's violation of Section 25401 by displaying, advertising and defending the contents of the Documents, as well as by drafting and negotiating additional documents used in the Transaction.

78. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**FOURTH CAUSE OF ACTION**

**(Sale of Securities in Violation of Cal. Corp. Code § 25110)**

**(Against Defendants Threw and TFA)**

79. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

80. Threw sold Plaintiff shares of TJTC, which are securities under California law. (Cal. Corp. Code §25019.)

81. Threw's offering in the Agreement was not qualified pursuant to California Corporations Code section 25110 *et seq*.

82. CCH is informed and believes that neither Threw nor TFA filed a Notice of Transaction in connection with the Agreement pursuant to California Corporations Code section 25102(f).

83. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's

favor and against Defendants for rescission of the Agreement and refund on of the consideration paid by CCH for the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**FIFTH CAUSE OF ACTION**

**(Sale of Securities in Violation of Cal. Corp. Code § 25210)**

**(Against Defendants TFA, Sells, Olson, and Kalagias)**

84. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

85. Upon information and belief, at the time of CCH's purchase of TJTC securities, none of the TFA-affiliated Defendants either obtained from any California securities administrator certificates authorizing them to act as securities broker-dealers, nor were exempted from doing so under Cal. Corp. Code § 25200 et seq.

86. Accordingly, all sales to CCH brokered by TFA and such other unlicensed defendants were unauthorized and in violation of California Corporations Code section 25210.

87. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest, and treble damages.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**SIXTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

**(Against Defendants Threw and TFA)**

88. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

89. Plaintiff is informed and believes, and upon that basis alleges, that: (1) Defendants Threw and TFA made representations to Windsor that certain statements regarding the Coastal Communications business were true; (2) those statements were not, in fact, true; (3) Defendants had no reasonable grounds upon which to believe those statements were true

when they made those statements to Windsor; (4) Defendants intended that Windsor rely on those representations; (5) Windsor reasonably relied on those representations; and (6) CCH was harmed as a result of Windsor's reliance on Defendants' representations.

90. Defendants made material misrepresentations and/or omitted material facts necessary to make their statements not misleading, including, but not limited to, the following:

**Misrepresentations in the Summary**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment; and

c. The business included a tenured team of twenty-one (21) employees.

**Misrepresentations in the Review**:

a. The seller training period was one (1) year;

b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment;

c. The business included a tenured team of twenty-one (21) employees;

d. The business's primary website domain was "under construction" and would have a new appearance in the coming months;

e. Threw's reason for selling the business was his desire to retire;

f. Threw's primary reason for exiting the business was that he had grandchildren that were growing up too fast, such that he wanted to take a step back and travel with his family;

g. Threw would stay with the business for six months after the closing, in order to provide a seamless transition of client relations and operations;

h. The business did not have any previous or pending lawsuits or other legal matters of which a new owner should be aware;

i. "Coastal Communications," the name of the business, was responsible for generating sales, notwithstanding that Threw had a good reputation based on years of experience in the industry;

j. Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base;

k. Threw's wife's role—handling billing, payroll, and accounting—was not a very active role, perhaps amounting to ten hours per month;

l. Any of the three managers could step up to take on Threw's responsibilities, since each managed his/her own projects;

m. HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, and Wyyerd were notable clients;

n. Only one client had discontinued Coastal Communications's services;

o. New or repeat clients usually approached Coastal Communications with business, rather than Coastal Communications seeking out clients;

p. Coastal Communications did not have a slower season throughout the holidays; and

q. Coastal Communications' recent hiring of new employees was the result of previous employees' moves further from the office and/or desire to continue working from home.

**Misrepresentation in the Balance Sheet**

r. As of December 31, 2023, the value of the total assets of Coastal Communications was approximately $30,000 higher than the true value of such assets, according to QuickBooks Online.

**Misrepresentations in the June Letter**

s. Coastal Communications expected to receive a purchase order from Advantage Engineering AT&T in July 2024 for 17 small cell designs;

t. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle T-Mobile Small Cell in July 2024 for over 100 designs; and

u. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle Verizon Small Cell in September 2024 for over 100 designs.

91. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**SEVENTH CAUSE OF ACTION**

**(Intentional Misrepresentation)**

**(Against Defendants Threw and TFA)**

92. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

93. Plaintiff is informed and believes, and upon that basis alleges, that: (1) defendant Threw and TFA made representations to Plaintiff that certain statements regarding the Coastal Communications business were true; (2) those statements were false; (3) Defendants knew the statements were false when they made them, or they made those representations recklessly and without regard for their truth; (4) Defendants intended Plaintiff rely on those representations; (5) Plaintiff did reasonably rely on those representations; and (6) Plaintiff was harmed by his reliance on Defendants' representations.

94. Defendants made intentional material misrepresentations and/or intentionally omitted material facts necessary to make their statements not misleading, including, but not limited to, the following:

**Misrepresentations in the Summary**:

a. The seller training period was one (1) year;
b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment; and
c. The business included a tenured team of twenty-one (21) employees.

**Misrepresentations in the Review**:

a. The seller training period was one (1) year;
b. A 10% down payment of $83,500 would return $143,115 in the first year after debt payments, which is a 171% return on investment;
c. The business included a tenured team of twenty-one (21) employees;
d. The business's primary website domain was "under construction" and would have a new appearance in the coming months;
e. Threw's reason for selling the business was his desire to retire;
f. Threw's primary reason for exiting the business was that he had grandchildren that were growing up too fast, such that he wanted to take a step back and travel with his family;
g. Threw would stay with the business for six months after the closing, in order to provide a seamless transition of client relations and operations;
h. The business did not have any previous or pending lawsuits or other legal matters of which a new owner should be aware;
i. "Coastal Communications," the name of the business, was responsible for generating sales, notwithstanding that Threw had a good reputation based on years of experience in the industry;

j. Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base;

k. Threw's wife's role—handling billing, payroll, and accounting—was not a very active role, perhaps amounting to ten hours per month;

l. Any of the three managers could step up to take on Threw's responsibilities, since each managed his/her own projects;

m. HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, and Wyyerd were notable clients;

n. Only one client had discontinued Coastal Communications's services;

o. New or repeat clients usually approached Coastal Communications with business, rather than Coastal Communications seeking out clients;

p. Coastal Communications did not have a slower season throughout the holidays; and

q. Coastal Communications' recent hiring of new employees was the result of previous employees' moves further from the office and/or desire to continue working from home.

**Misrepresentation in the Balance Sheet**

r. As of December 31, 2023, the value of the total assets of Coastal Communications was approximately $30,000 higher than the true value of such assets, according to QuickBooks Online.

**Misrepresentations in the June Letter**

s. Coastal Communications expected to receive a purchase order from Advantage Engineering AT&T in July 2024 for 17 small cell designs;

t. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle T-Mobile Small Cell in July 2024 for over 100 designs; and

u. Coastal Communications expected to receive a purchase order in excess of $200,000 from Crown Castle Verizon Small Cell in September 2024 for over 100 designs.

Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

95. In addition, given that Defendants' conduct amounts to oppression, fraud, and malice, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**EIGHTH CAUSE OF ACTION**

**(Violations of Section 17200 of the Business & Professions Code)(Against Defendant TFA)**

96. Plaintiff incorporates by reference the allegations of paragraphs 1 through 55 as though fully set forth herein.

97. California Business and Professions Code sections 17200 et seq. (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair, or fraudulent business act or practice; any unfair, deceptive, untrue or misleading advertising; and any violation of Business and Professions Code section 17500 *et seq*.

98. Defendant TFA violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to: making and/or disseminating false, misleading, and deceptive statements to the public, including Plaintiff.

99. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendant TFA for (i) rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares

since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

On the **First Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares.

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For costs of suit incurred herein; and

(4) For such other and further relief as the Court deems just and proper.

On the **Second Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares.

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For costs of suit incurred herein; and

(4) For such other and further relief as the Court deems just and proper.

///

On the **Third Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares;

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For costs of suit incurred herein;

(4) For reasonable attorneys' fees, pursuant to California Corporations Code section 25501; and

(5) For such other and further relief as the Court deems just and proper.

On the **Fourth Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares;

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For costs of suit incurred herein; and

(4) For such other and further relief as the Court deems just and proper.

On the **Fifth Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares;

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For reasonable attorneys' fees, pursuant to California Civil Procedure Code section 1029.8(a);

(4) For costs of suit incurred herein;

(5) For treble damages, pursuant to California Civil Procedure Code section 1029.8(a); and

(6) For such other and further relief as the Court deems just and proper.

On the **Sixth Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares;

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;;

(3) For costs of suit incurred herein; and

(4) For such other and further relief as the Court deems just and proper.

On the **Seventh Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares;

(2) For prejudgment interest as provided by law, running from the date of CCH's investment;

(3) For punitive and exemplary damages;

(4) For costs of suit incurred herein; and

(5) For such other and further relief as the Court deems just and proper.

On the **Eighth Cause of Action**:

(1) For rescission of the Agreement and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares;

(2) For a civil penalty in the amount of $2,500 for each violation of the California Unfair Competition Law, according to proof;

(3) For a civil penalty in the amount of $2,500 for each violation of California Business and Professions Code section 17500, according to proof;

(4) For costs of suit incurred herein; and

(5) For such other and further relief as the Court deems just and proper.

DATED: April 29, 2025

NIESAR & VESTAL LLP

s/John A. Kelley
John A. Kelley
Attorneys for Plaintiff
E-mail: jkelley@nvlawllp.com

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues triable by a jury.

DATED: April 29, 2025

NIESAR & VESTAL LLP

s/John A. Kelley
John A. Kelley
Attorneys for Plaintiff
E-mail: jkelley@nvlawllp.com