UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL COMMUNICATIONS HOLDINGS,<br>Plaintiff,<br>v.<br>TODD THREW; THE FIRM ADVISORS, LLC; JARED OLSON; COURTNEY SELLS; MAYKAYLA KALAGIAS; and DOES 1-10,<br>Defendants. | Case No.: 3:25-cv-01102-TWR (DEB)<br>**ORDER GRANTING IN PART AND DENYING IN PART: DEFENDANT THREW'S MOTION TO DISMISS; AND DEFENDANTS MAYKAYLA KALAGIAS, JARED OLSON, CORTNEY SELLS, AND THE FIRM ADVISORS, LLC'S MOTION TO DISMISS**<br>(ECF Nos. 9, 15) |

Presently before the Court is Defendant Todd Threw's Motion to Dismiss ("Threw MTD," ECF No. 9) and Defendants Maykayla Kalagias, Jared Olson, Cortney Sells, and The Firm Advisors, LLC's Motion to Dismiss ("TFA MTD," ECF No. 15), both of which are fully briefed. (*See* ECF Nos. 13 ("Threw Opp'n), 17 ("Threw Reply"), 20 ("TFA Opp'n"), 22 ("TFA Reply). The Court heard oral argument on the Motions on November 13, 2025. (*See* ECF No. 23). Having carefully reviewed the Parties' arguments, the record, and the law, the Court **GRANTS IN PART AND DENIES IN PART** both Motions to Dismiss.

## BACKGROUND

## I. Factual Background

Michael Windsor ("Windsor") is the sole director and shareholder of Plaintiff Coastal Communications Holdings ("CCH"). (*See* ECF No. 1 ("Compl.") ¶ 6.) Plaintiff alleges that Defendant Todd Threw, the former owner of TJT Communications, Inc. dba Coastal Communications ("TJTC") made various misrepresentations in connection with Plaintiff's purchase of TJTC's shares. (*See generally* Compl.) Plaintiff also alleges that the brokers of the sale, Defendants Maykayla Kalagias, Jared Olson, Cortney Sells, and The Firm Advisors, LLC ("TFA") participated in the misrepresentations in connection with the sale. (*See id.*)

### *A. The Purchase of the Business*

The process of Plaintiff purchasing TJTC's shares began when Windsor saw an advertisement leading him to a TFA website posting which stated, "FOR SALE: Site Planning and Survey Firm: Niche in Telecom with 21 on Staff" and listed facts about the business available for sale. (Compl. ¶ 15; ECF No. 1-2, Exh. 1 ("Summary").) The Summary contained the following statements:

1. "Seller Training Period: 1 year"
2. "A 10% down payment of $83,500 returns $143,115 in the first year after debt payments, which is a 171% return on investment!!"
3. "Personnel: 21"

(Summary at 1.) Windsor reviewed the Summary and TFA's website which explained that TFA helps broker business sale transactions including coordinating due diligence, preparing a successful closing, and facilitating a smooth transition. (Compl. ¶¶ 16–17.) Windsor then reached out to TFA about the business for sale, signed an NDA, and received a "Confidential Business Review." (*Id.* ¶ 17; ECF No. 1-2 Exh. 2 ("Review").) The Review identified the business for sale as "Coastal Communications and identified Threw as the business owner." (Compl. ¶ 17.) The Review contained the following statements:

1. "Seller Training Period: 1 year" (Review at 1.)

2. "A 10% down payment of $83,500 returns $143,115 in the first year after debt payments, which is a 171% return on investment!!" (*Id.* at 2.)
3. "Personnel: 21" (*Id.* at 1.)
4. "[T]he seller has indicated that this website will be 'under construction' and will have a new appearance in the coming months." (*Id.*)
5. "Reason for Selling: As Todd approached retirement age – he is looking to slowly divest." (*Id.* at 3.)
6. "What is your primary reason for exiting the business? I want to take a step back and travel with my family, we have grandkids that are growing up too fast!" (*Id.* at 9.)
7. "In order to provide a seamless transition of client relations and operations, Todd has offered to stay with the business for 6 months post-close." (*Id.* at 3.)
8. "Do you have any pending or previous lawsuits or legal matters that a new owner would discover during due diligence that we should know about? No." (*Id.*)
9. "What percentage of sales are generated by the owner? The name of the business itself is responsible. I have a good reputation after being in the industry for so long, but Coastal Communications is the important name." (*Id.*)
10. "Coastal Communication has built relationships with their clients over the years resulting in repeat work and a strong referral base." (*Id.* at 9.)
11. "My wife handles the finances, but this is not a very active role maybe 10 hours a month. She plans on exiting the business with me but her responsibilities can be easily absorbed." (*Id.* at 4.)
12. "Do you have any staff close to your proximity in experience? Is anyone ready to step up and take on your responsibilities? Any of the 3 managers could be, they each manage their own projects. It would probably be needed to at least replace me in some manner or promote someone with in to be a project manager or hire an entry level PM." (*Id.*)

13. "Notable [Client] Names: HP Communications, AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Century Link, Vinculums, Mobilitie, Extenet, Crown Castle, Ubiquity, Wyyerd." (*Id.* at 8.)
14. "How many clients have joined/discontinued services in the last 5 years. . . . Discontinued: 1" (*Id.* at 9.)
15. "Where do your clients come from? Referrals, marketing? We don't market, we rarely approach them. It's usually that they approach us, whether it be a new referral or a repeat client" (*Id.*)
16. "From personal experience, we have a slower season throughout the holidays. Do you have a similar outlook during this season? We actually have the opposite experience. During November and December, we experience more requests for our services but the suppliers have a hard time keeping up with the materials we need to complete the work throughout the holiday season. Due to the population in Southern California, there is a huge demand for telecom services. We will not over promise anything for our customers and they appreciate the honesty." (*Id.*)
17. "Why were new employees recently hired? As we began bringing more people back to the office on a regular basis, some did not want to give up working from home and chose to take a position with less of a commute. Some had moved during the 2020-2022 further from the office and realized that the commute was not desirable." (*Id.* at 10.)

Windsor then began buying "all the outstanding shares of TJTC," with TFA serving as the broker (the "Transaction"). (Compl. ¶¶ 18–20.) Plaintiff CCH was formed to purchase the shares. (*See id.* ¶ 21.) Prior to the closing of the sale, Threw's wife Jeanine sent Windsor a final Balance Sheet from January 2024 ("Balance Sheet"), which "overstated the value of the business's assets by over $30,000." (*Id.* ¶ 31.) Then on June 17, 2024, "Threw sent CCH a letter . . . setting forth the status of several signed Coastal Communications projects." (*Id.* ¶ 32; ECF No. 1-2 Exh. 3 ("June Letter").) The June Letter listed one of the "Current Signed PO Project[s]" as "Advantage Engineering AT&T small cell designs

(17 total, expect PO by July 15th) $37,000.00." (June Letter at 1.) The June Letter also listed additional projects on the horizon as "Crown Castle T-Mobile Small Cell: 100+ sites to be designed with an ETA of July, 2024 Estimated PO amount $200,000.00+" and "Crown Castle Verizon Small Cell: 100+ sites to be designed with an ETA of September 2024 Estimated PO amount $200,000.00+." (*Id.* at 1–2.)

The same day Threw sent the June Letter, Threw emailed Defendant Courtney Sells stating "'I probably need to have a meeting with Michael [Windsor] to share that work has significantly slowed over the past 4 weeks due to it being an election year, interest rates for construction and now the lay offs by one of our biggest clients. . . . Not a good time at the moment.'" (Compl. ¶ 35.) The next day, Threw emailed one of TJTC's vendors stating, "Boy, it has slowed down for us the past month." (*Id.* ¶ 36.) Threw did not inform Windsor of the business slow down. (*Id.*)

Plaintiff alleges the statements identified from the Summary, Review, June Letter, and Balance Sheet were untrue. (*Id.* ¶ 34.) Plaintiff alleges the accurate facts are:

1. "Threw only wanted to stay on for three months after the Transaction." (*Id.* ¶ 34(a).)
2. "A 171% return on an investment of $83,500 in the first year could not be accomplished." (*Id.* ¶ 34(b).)
3. "Nine critical employees listed in the Review had left their Coastal Communications employment by the close of escrow." (*Id.* ¶ 34(c).)
4. "Threw did not revise and improve the Coastal Communications website, as represented in the Review, prior to the closing." (*Id.* ¶ 34(e).)
5. "Threw's actual reason for selling Coastal Communications was that it was not financially viable." (*Id.* ¶ 34(f).)
6. TJTC settled a "personal injury lawsuit" in the Superior Court of California. (*Id.* ¶ 38.)
7. "Threw was the key in bringing business prior to the Transaction." (*Id.* ¶ 39.)
8. Management of the billing, payroll, and accounting is a "very active role" currently requiring "at least 40 hours per month." (*Id.* ¶ 40.)

9. "None of the three managers could or can run the business." (*Id.* ¶ 41.)

10. "The list of Coastal Communications clients provided by Threw to Windsor prior to the closing of the Transaction was not accurate. At the time of the closing, Coastal Communications did not have AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Vinculums, Mobilitie, or Extenet as clients." (*Id.* ¶ 42.)

11. "Coastal Communications had lost a majority of the clients listed in the Review at the time of the closing." (*Id.* ¶ 43.)

12. "Coastal Communications had poor results during the November/December 2024 holiday season" and "November and December have been historically slow for Coastal Communications." (*Id.* ¶ 44.)

13. "Coastal Communications hired new employees prior to the Transaction because more tenured employees had resigned due to poor company culture and compensation." (*Id.* ¶ 45.)

14. "The representation in the Review that a buyer would earn a 171% return on an $83,500 investment in the first year was an arbitrary statement with no basis in fact." (*Id.* ¶ 46.)

15. "The customer purchase orders referenced in the June Letter did not exist." (*Id.* ¶ 47.)

Windsor asserts that if he had known the accurate facts, he "would not have caused CCH to enter into the Transaction on the terms ultimately set forth in the Agreement." (*Id.* ¶ 50.) As a result of entering the Transaction, Plaintiff has allegedly incurred "at least $435,000 in unanticipated expenditures related to the dire state of the Coastal Communications business." (*Id.* ¶ 54.)

***B. The Stock Purchase Agreement***

The Parties completed the Transaction by executing a Stock Purchase Agreement ("SPA"). (*See id.* ¶ 23; ECF No. 9-2 ("SPA").)[1] The SPA makes three pages of

[1] The Parties agree that the substance of the SPA is relevant and referenced throughout Plaintiff's Complaint and thus should be incorporated by reference. (*See* ECF No. 23; Threw MTD at 3; Threw

representations and contains an "as is" clause. (*See* SPA ¶ 3.17.) Section 10.1 of Article X states that the SPA is a complete and exclusive statement of the agreement. Exhibit C of the SPA is a "Transition Agreement" that provides recitals on how Threw will support the Plaintiff after closing. The June Letter from Threw is also attached as an Exhibit to the SPA. (*See id.* at Schedule 3.12.)

### *C. TFA's Involvement in the Sale*

Plaintiff alleges that TFA served as broker and participated in the negotiations between Windsor and Threw, which resulted in the ultimate sale of TJTC's shares. (Compl. ¶ 18.) Plaintiff, on information and belief, alleges Threw paid TFA a "substantial fee" for brokering the sale. (*Id.* ¶ 27.) Jared Olson, "TFA's in-house counsel and a member of the State Bar of California, facilitated the negotiations between Threw and Windsor and, together with Threw, drafted the documentation employed to complete" the sale. (*Id.* ¶ 23.) Courtney Sells is TFA's president and Maykayla Kalagias is TFA's brokerage principal. (*Id.* ¶¶ 10–11.)

During negotiations, TFA was "unregistered in California and therefore unauthorized to conduct business in the State." (*Id.* ¶ 51.) Further, "TFA was not licensed to broker the purchase or sale of securities in California, nor was TFA authorized to broker the sale of a business in California." (*Id.* ¶ 52.)

/ / /

/ / /

---

Opp'n at 18; TFA MTD at 15–16.) "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Parties do not dispute the contents of the SPA, but there is some confusion over the correct operative date. The Complaint alleges Windsor and Threw executed the SPA effective June 7, 2024, and the sale closed on June 21, 2024. (*See* Compl. ¶¶ 26, 33.) Defendant Threw's Request for Judicial Notice (ECF No. 9-2) attached an SPA with the operative date of June 11, 2024. (*See id.* at 5.) And the TFA Defendants contend that the operative date of the SPA is June 28, 2024. (*See* TFA MTD at 9.) The correct operative date of the SPA will likely need to be determined at some point in this case. However, because the Court would reach the same result regardless of whether the SPA was incorporated by reference or not and the Parties do not dispute the contents of the SPA, the Court assumes without deciding that the incorporation by reference doctrine applies.

## II. Procedural History

On April 30, 2025, Plaintiff filed its Complaint, alleging various securities fraud causes of action relating to its purchase of Threw's business, brokered by TFA. (*See* ECF No. 1.) On July 21, 2025, Defendant Todd Threw filed a Motion to Dismiss for Failure to State a Claim. (*See* ECF No. 9.) On September 2, 2025, Defendants Maykayla Kalagias, Jared Olson, Cortney Sells, and The Firm Advisors, LLC ("TFA Defendants") filed a Motion to Dismiss for Failure to State a Claim and Lack of Personal Jurisdiction over the Individual TFA Defendants. (*See* ECF No. 15.)

## III. TFA Defendants' 12(b)(2) Motion

TFA Defendants do not argue the Court lacks personal jurisdiction over The Firm Advisors, LLC; instead, they argue there is no specific personal jurisdiction over the Individual TFA Defendants (Maykayla Kalagias, Jared Olson, and Cortney Sells) who are Nebraska residents. (*See* TFA MTD at 12.) The claims against the Individual TFA Defendants include (1) violations of Section 10(b) of the Exchange Act and SEC Rule l0b-5, (2) Securities Fraud pursuant to Cal. Corp. Code §§ 25401 and 25501, and (3) Sale of Securities in Violation of Cal. Corp. Code § 25210. (*See generally* Compl.)

Plaintiff alleges all the Individual TFA Defendants participated in TFA's brokering of the deal between Plaintiff and Defendant Threw and thus there is specific personal jurisdiction in California. (*See* TFA Opp'n at 8–9.) The Individual TFA Defendants do not deny their participation in the brokering of the sale but argue that "Defendants themselves did nothing directed explicitly at California." (TFA Reply at 8.) For the reasons discussed below, the Court **DISMISSES** Defendants Sells and Kalagais for lack of personal jurisdiction and **DENIES** the 12(b)(2) Motion to Dismiss as to Defendant Olson.

### *A. Legal Standard*

"A Court's power to exercise jurisdiction over a party is limited by both statutory and constitutional considerations." *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1135 (S.D. Cal. 2018). Constitutionally, "[t]he Due Process Clause of the

Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). Statutorily, "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see also* Cal. Civ. Proc. Code § 410.10.

The Supreme Court has recognized "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 262 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* (quoting *Goodyear*, 564 U.S. at 924). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Id.* (emphasis in original) (citing *Goodyear*, 564 U.S. at 919).

For a state court to exercise specific jurisdiction, by contrast, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear*, 564 U.S. at 919). Specific jurisdiction is analyzed under a three-prong test: "(1) The non-resident defendant must *purposefully direct his activities* or consummate some transaction with the forum or resident thereof; *or* perform some act by which he *purposefully avails himself* of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Mavrix Photo, Inc. v. Brand Techs.*, Inc., 647 F.3d 1218, 1227–28 (9th Cir. 2011) (emphasis in original) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). The plaintiff bears the burden of establishing the first two prongs

and if they do, the burden then shifts to the defendant "to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* at 1228 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

Under prong one, for suits sounding in fraud, a purposeful direction analysis is most often used. *See Lyddon v. Rocha–Albertsen*, 2006 WL 3086951, at *26 (E.D. Cal. 2006).[2] To establish purposeful direction, there is a three-part test stemming from the case *Calder v. Jones*, 465 U.S. 783 (1984). *See Schwarzenegger*, 374 F.3d at 803. Under the *Calder* effects test, the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citing *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

Under prong two, for the claim to "arise out" of forum-related activities, a "Plaintiff[] must show that [it] would not have suffered an injury 'but for' [the Defendant's] forum related conduct." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001). Lastly, the Ninth Circuit applies a seven-part balancing test to determine whether a case satisfies the "fair play and substantial justice" element. *See Dole Food Co.*, 303 F.3d at 1114.

### *A. Fiduciary Shield Doctrine*

Under the fiduciary shield doctrine, the fact that a "corporation is subject to local jurisdiction does not necessarily mean its nonresident officers, directors, agents, and employees are suable locally as well." *Winery v. Graham*, No. C 06–3618 MHP, 2007 WL 963252, at *5 (N.D. Cal. Mar. 2007) (quoting *Colt Studio, Inc. v. Badpuppy Enterprise*, 75 F.Supp.2d 1104, 1111 (C.D. Cal. 1999)). But the individual TFA Defendants' status as "employees does not somehow insulate them from jurisdiction." *Calder*, 465 U.S. at 789–90. Jurisdiction is proper over a corporate employee when the plaintiff shows that the

---

[2] In a securities case, there is often "elements both of purposeful availment and purposeful direction." *In re LDK Solar Securities Litigation*, No. C0705182WHA, 2008 WL 4369987, at *6 (N.D. Cal. 2008). Because the Court finds that the result is the same under either test, only the analysis for purposeful direction is provided.

"corporate employee is the moving, active, conscious force behind the infringing activity by demonstrating that the corporate officer directs, controls, ratifies, or participates in the infringing activity." *Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*, No. C 08-04078 CW, 2009 WL 1033818, at *3 (N.D. Cal. Apr. 16, 2009). "Accordingly, for purposes of specific jurisdiction, the Court's analysis is little altered by the fiduciary shield doctrine." *Lewis v. Travertine, Inc.*, No. 2:17-cv-00016-CAS (JCX), 2017 WL 1511292, at *6 (C.D. Cal. Apr. 24, 2017).

### ***B. Defendant Olson***

Defendant Olson is TFA's in-house legal counsel and an active member of the State Bar of California. (*See* Compl. ¶ 9.) Defendant Olson is also a Nebraska attorney and a Nebraska resident. (*See* TFA MTD at 12.) Plaintiff alleges that Defendant Olson facilitated the negotiations between Threw and Windsor and co-drafted with Threw the Transaction documents, including the SPA. (*See* TFA Opp'n at 8) (citing Compl. ¶¶ 14, 17.) The TFA website also stated, "our In-House Legal Counsel works closely with attorneys, CPA's and lending institutions to fine tune deal points over 30 to 60 days." (Compl. ¶ 16.) While Defendant Olson has traveled to California for work, (*see* ECF No. 15-4 ("Olson Decl.") ¶ 4), Defendant Olson did not travel to California in connection with the Transaction at issue. (*See id.* ¶ 5.)

#### *1. Purposeful Direction*

Under prong one of specific jurisdiction, the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *See Schwarzenegger*, 374 F.3d at 803. To establish specific personal jurisdiction, "[a]ll three parts of the test must be satisfied." *Id.* at 805.

##### a. Intentional Act

The word "act" has been defined as "an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." *Id.*

(citing Restatement (Second) of Torts § 2 (1964)). Here, Plaintiff alleges Defendant Olson negotiated and helped draft the SPA, which is an intentional act. (*See* Compl. ¶¶ 14, 17.)

b. Expressly Aimed

The second element of the *Calder* effects test "requires that the defendant's conduct be expressly aimed at the forum." *Liberty Media Holdings, LLC v. Tabora*, No. 11-CV-651-IEG JMA, 2011 WL 4626162, at *4 (S.D. Cal. Oct. 4, 2011) (citation omitted). Here, Plaintiff sufficiently alleges Defendant Olson's conduct was expressly aimed at California because Defendant Olson knew he was negotiating and drafting the sale of shares of a business operating in California, to a different business with its primary place of business in California, according to California law. (*See* Compl. ¶¶ 19, 21–23, 25; SPA ¶¶ 3.6 (stating "the Company is a duly organized corporation, validly existing and in good standing in the state of California"), 10.6 (stating the "Agreement shall be governed by and construed in accordance with the laws of the State of California").) Defendant Olson, therefore, expressly reached out towards California. *See Dole Food Co.*, 303 F.3d at 1112 (concluding that because the defendants "knew that Dole's principal place of business was in California, knew that the decisionmakers for Dole were located in California, and communicated directly with those California decisionmakers, . . . their actions were 'expressly aimed' at the forum state").

c. Harm in the Forum State

To establish the third prong of the *Calder* effects test, a defendant's actions must cause harm the defendant knows is likely to be suffered in the forum state. *See Mavrix*, 647 F.3d at 1228. The Court rejects the TFA Defendants' argument that "Plaintiff would have experienced the same alleged harm if he had lived in Nevada, Florida, Oregon, Texas, or anywhere else." (TFA Reply at 8.) Because the business at issue is located in California, the effects of the alleged misrepresentations are necessarily felt in California and Defendant Olson, who negotiated the sale, would reasonably have known any injury would be felt in California. *See Ciuffitelli v. Deloitte & Touche LLP*, No. 3:16-CV-00580-AC, 2018 WL 4568737, at *19 (D. Or. Aug. 1, 2018), *report and recommendation adopted*,

No. 3:16-CV-00580-AC, 2018 WL 4568586 (D. Or. Sept. 21, 2018) (finding "it was not only foreseeable, but entirely predictable, that by overstating the value of Oregon entities for an Oregon seller of securities that economic harm was likely to result in Oregon" and thus the third prong of purposeful direction was satisfied).

*2. Arising Out of Defendant Olson's Conduct*

Analyzing prong two of specific jurisdiction, the Court finds Plaintiff's injury arose out of the Transaction facilitated by Defendant Olson. Because Plaintiff's losses would not have occurred but for Defendant Olson's negotiation and drafting of the SPA, prong two is satisfied. *See Tan v. Quick Box, LLC*, No. 3:20-CV-01082-H-DEB, 2020 WL 7226440, at *12 (S.D. Cal. Dec. 8, 2020) (finding prong two was established when the plaintiff's injury arose out of her experience with products that were shipped to her and the individual defendants directly controlled and participated in the shipping and fulfillment services).

*3. Reasonableness*

Lastly, under prong three of specific jurisdiction, the Court considers the following seven factors: "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004) (citation and quotation marks omitted). The Court does not find that requiring Defendant Olson, a California-licensed attorney who has traveled to California for work, to litigate in California would be unduly burdensome. (*See* Olson Decl. ¶¶ 2, 4.) Further, the Court rejects TFA Defendants' argument that "California's interest is minimal" (TFA Reply at 13); rather, California has a strong interest in litigating cases involving a California business and California residents. *See Dole Food Co.*, 303 F.3d at 1115–16. Further, there is no indication that resolving this case in California would

be inefficient, and litigating this case in California would significantly assist Plaintiff in obtaining convenient relief. Finally, Defendant Olson does not assert there is a more appropriate alternative forum. (*See generally* TFA MTD.) Considering all the factors, the Court finds that the exercise of personal jurisdiction over Defendant Olson comports with fair play and substantial justice. The TFA Defendants' 12(b)(2) Motion with respect to Defendant Olson is **DENIED**.

***D. Defendant Sells***

Defendant Sells is a Nebraska resident and TFA's president. (*See* Compl. ¶ 10.) Defendant Sells has traveled to California for work two times in the last fifteen years, neither of which were related to the Transaction at issue. (*See* ECF No. 15-2 ("Sells Decl.") ¶¶ 3–4.) Plaintiff alleges Defendant Sells is responsible for the "Who We Are and What We Do" section of the TFA website which states "as President, I'll personally see to your needs as we engineer your deal." (Compl. ¶ 16.) Plaintiff also alleges Threw emailed Defendant Sells stating that he needed to have a meeting with Windsor because of the work slowdown. (*Id.* ¶ 35.) But Plaintiff fails to allege any specific conduct or independent act by Defendant Sells. Further, at the hearing, Plaintiff's counsel conceded that personal jurisdiction was not sufficiently alleged for Defendant Sells. (*See* ECF No. 23.) The Court therefore **GRANTS** TFA Defendants' 12(b)(2) Motion with respect to Defendant Sells and **DISMISSES** Defendant Sells for lack of personal jurisdiction.

***E. Defendant Kalagias***

Defendant Kalagias is a Nebraska resident and TFA's brokerage principal. (Compl. ¶ 11.) Other than conclusory allegations about Defendant Kalagias participating in the brokering of the sale, (*see generally id.*), Plaintiff fails to allege any specific acts by Defendant Kalagias. Because Plaintiff has failed to allege Defendant Kalagias was anything more than an employee of TFA, the Court does not have specific personal jurisdiction over Defendant Kalagias. *See Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 948–949 (N.D. Cal. 2014) (finding no personal jurisdiction over employee defendants that were only communicating with the plaintiff on behalf of the corporate

defendant and were otherwise unconnected to the forum state). Further, at the hearing, Plaintiff's counsel conceded that personal jurisdiction was not sufficiently alleged for Defendant Kalagias. (*See* ECF No. 23.) The Court therefore **GRANTS** TFA Defendants' 12(b)(2) Motion with respect to Defendant Kalagias and **DISMISSES** Defendant Kalagias for lack of personal jurisdiction.

## IV. Defendants' 12(b)(6) Motions

Because Plaintiff alleges multiple causes of action against Defendant Threw and some or all of the TFA Defendants, the Court considers the 12(b)(6) arguments claim by claim.

### *A. Legal Standard*

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). If the court dismisses a complaint for failure to state a claim under Rule 12(b)(6), the "court should grant leave to amend even if no request

to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

Further, under Rule 9(b), when a party alleges fraud, they "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, the Private Securities Litigation Reform Act ("PSLRA") requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). The PSLRA also requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2)(A).

***B. Section 10(b) of the Exchange Act of 1934***

The elements of a federal securities fraud Section 10(b) claim are "(1) a material misrepresentation or omission, (2) scienter, *i.e.,* a wrongful state of mind, (3) a connection to the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation, *i.e.,* a causal connection between the material misrepresentation and the loss." *Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1136 (S.D. Cal. 2008). For the reasons discussed below, the Court **GRANTS** Defendant Threw and TFA Defendants' Motions to Dismiss the Section 10(b) claim for failure to state a claim.

*1. Material Misrepresentation or Omission*

"To prevail on a § 10(b) claim, a plaintiff must show the defendant made a statement that was '*misleading* as to a *material fact*.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018). "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not

been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). "Pure omissions are not actionable under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). However, "'representations that state the truth only so far as it goes, while omitting critical qualifying information,'" or half-truths, are actionable. *Id.* (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)). Plaintiff alleges four sources of material misrepresentations and/or omitted material facts: (1) the Summary, (2) the Review, (3) the Balance Sheet, and (4) the June Letter. (*See* Compl. ¶ 57.)

a. Maker of the Statement

"Rule 10b-5 liability is limited to parties who actually 'make' misstatements of fact." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1060 (N.D. Cal. 2013) (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)). "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc.*, 564 U.S. at 142. This means that one who "prepares or publishes a statement on behalf of another is not its maker" and "attribution to another party generally indicates that the attributed party is the 'maker.'" *Id.* at 142–143.

TFA Defendants argue Plaintiff has either only made group pleadings or attributed misrepresentations to Threw, not the TFA Defendants. (*See* TFA MTD at 20.) The TFA Defendants are partially correct. Plaintiff alleges "Defendants made material misrepresentations and/or omitted material facts" and repeatedly refers to "Defendants" as a group. (*See, e.g.,* Compl. ¶ 58 (stating "Defendants made the foregoing material misrepresentations").) The group pleading doctrine, which allowed a presumption that false and misleading information was made by collective action, did not survive the PSLRA. *See In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1031 (S.D. Cal. 2006). Therefore, Defendants cannot be liable for the alleged misstatement "except to the

extent there are specific statements attributed to them." *In re New Century*, 588 F. Supp. 2d 1206, 1224 (C.D. Cal. 2008).

Here, the June Letter is attributed to Threw, the Balance Sheet is attributed to Jeanine (Threw's wife), and the Summary and Review were allegedly prepared by TFA with input from Threw. (*See* Compl. ¶¶ 28, 31, 32.) Based on Plaintiff's allegations, the Balance Sheet is not actionable because Jeanine Threw is not a party to this case and she is the alleged maker of the statement. Next, the June Letter is actionable against Defendant Threw who signed the email and thus is its maker. Finally, for the statements in the Summary and Review, while the Complaint alleges that they were prepared by TFA with input from Threw, Plaintiff argues in its Opposition that "TFA and its agents represented the information in the Summary and the Review and reiterated defendant Threw's misrepresentations." (TFA Opp'n at 17.)

For the Review, the Court finds it clear that quotes from Defendant Threw are attributable to him as the maker. (*See, e.g.*, Review at 3 ("Q&A with the Seller").) However, other statements in the Review appear to be attributable to TFA and its analysis of the business. For example, the funding example that touts a potential 171% return on investment is stated on the first page in two places and does not reference Threw. (*See id.* at 1.) Further, the Summary provides an analysis by Defendant TFA without any reference Defendant Threw. (*See generally* Summary.) Therefore, both Defendant TFA and Defendant Threw are potential makers of allegedly material misstatements.

But the Complaint is devoid of allegations that any of the Individual TFA Defendants were the "maker" of any statements. (*See generally* Compl.) Plaintiff appears to recognize this deficiency and alleges it intends to amend its Complaint to "allege the specific individuals who . . . prepared the documents containing misrepresentations." (TFA Opp'n at 19.) Thus, the Court **DISMISSES** the Section 10(b) claim against the Individual TFA Defendants.

/ / /

/ / /

b. Falsity of Alleged Misstatements

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)). Finally, the complaint must allege that the statements were false "when made." *Id.* at 618.

As a preliminary issue, the Court disapprovingly notes that the Complaint repeatedly mischaracterizes or omits pertinent parts of the alleged misstatements. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 932 (9th Cir. 1996) (stating "omitting pertinent parts of the challenged statements" is a litigation tactic that makes it difficult for courts to determine the merits of a claim).[3]

Turning to the merits, the Court agrees with Defendants that Plaintiff largely makes conclusory allegations of falsity without providing any factual basis. For example, Plaintiff alleges, "[t]he representation in the Review that a buyer would earn a 171% return on an $83,500 investment in the first year was an arbitrary statement with no basis in fact." (Compl. ¶ 46.) As another example, Plaintiff alleges, "[n]one of the three managers could

[3] For example, the allegation relating to business during the holiday season was significantly altered in the Complaint, compared to the statement in the Review. The Review stated "[d]uring November and December, we experience more requests for our services, but the suppliers have a hard time keeping up with the materials we need to complete the work throughout the holiday season." (Review at 9.) But the Complaint alleges the Review stated, "Coastal Communications did not have a slower season throughout the Holidays." (Compl. ¶ 30(p).)

or can run the business." (*Id.* ¶ 41.) The Complaint does not provide facts illustrating why the managers could not run the business or why a 171% return on investment was not possible. Thus, Plaintiff fails to allege falsity with the required specificity. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 869 (N.D. Cal. 2004) (reasoning that the plaintiff "must rely on more than unidentified documents and unspecified sources and must plead the existence of inconsistent contemporaneous information"); *cf. Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1114 (C.D. Cal. 2012) (concluding that falsity was adequately pled when the complaint included "a chart that compared the figures" in the defendant's Chinese filings with their United States filings and showed that the United States filings were materially overstated).

Additionally, Plaintiff repeatedly fails to allege falsity at the time the statement was made. For example, the Complaint states, "*[a]t the time of the closing*, Coastal Communications did not have AT&T, Cox Communications, Zayo, Wilcon, Time Warner Cable, Vinculums, Mobilitie, or Extenet as clients," "Coastal Communications had lost a majority of the clients listed in the Review *at the time of the closing*," and "Coastal Communications hired new employees *prior to the Transaction* because more tenured employees had resigned." (Compl. ¶¶ 42–43, 45) (emphasis added). However, each of the allegedly false statements were made before the Transaction and before closing. Plaintiff, therefore, fails to allege that at the time the statement was made, the statement was false, or the speaker did not believe the statement and it was objectively untrue.

Further, the PSLRA protects forward-looking statements as nonactionable if the plaintiff fails to prove the statement "was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Here, as to the projects on the horizon listed in the June Letter, the Complaint does not allege that Threw made these statements with actual knowledge of their falsity. The Complaint only alleges "Windsor learned from Crown Castle that there were no such projects on the horizon." (Compl. ¶ 47.) This is not sufficient for Rule 9(b) or PSLRA pleading. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996) ("Plaintiffs have not shown that

Defendants had inside knowledge indicating that their statements were false when made as required under Rule 9(b). . . . Because Defendants' predictions proved to be wrong in hindsight does not render the statements untrue when made.").

Lastly, the Court agrees with Defendants that some of the alleged statements constitute non-actionable puffery. Puffery includes "statements that are "so 'exaggerated' or 'vague' that no reasonable investor would rely on the statement when considering the total mix of available information." *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008). For example, the statement "Coastal Communications had developed relationships with its clients over the years, resulting in repeat work and a strong referral base" is vague puffery. *See In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1076–77 (N.D. Cal. 2001) (dismissing references to "strong" demand as non-actionable puffery).

Because deficiencies plague Plaintiff's misrepresentation allegations, the Court declines to detail the pleading inadequacies in each alleged misstatement. The Court thus **DISMISSES** the Section 10(b) claim to the extent that it relies on material misrepresentations.

c. Misleading Statements Based on Omitted Information

The Court next turns to whether Plaintiff plausibly alleges statements were misleading because they omitted material information. The Court finds Plaintiff does not allege an actionable omission that explains "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The Complaint merely states "the Defendants made the foregoing material misrepresentations, omissions, and/or false promises in connection with the sale of securities to Plaintiff." (Compl. ¶ 58.) These allegations do not indicate which misrepresentations were in reality half-truths because of omitted information, therefore, the Court **DISMISSES** the Section 10(b) claim to the extent that it relies on omissions.

/ / /

/ / /

### 2. *Reliance*

"The question the reliance analysis ultimately seeks to resolve is simply whether the alleged misrepresentations were a cause in fact of the plaintiff's injury."[4] *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992). This means that an investor cannot close his eyes to a known risk and then claim later he relied on the lie. *See id.*

#### a. The SPA's "As Is" and Integration Clauses

As a preliminary matter, Defendant Threw concedes the June Letter is an Exhibit to the SPA and thus the "as is" clause cannot prevent reasonable reliance on its representations. (Threw MTD at 10.) But for the other representations in the Summary, Review, and Balance Sheet, Defendants argue that "no reliance clauses" like the "as is" clause in the SPA prevent reliance on statements outside the SPA as a matter of law. (Threw MTD at 7; TFA MTD at 16–19.) Defendant Threw also argues "[e]ven an integration clause, standing alone, is sufficient to prevent a plaintiff from establishing reasonable reliance in a securities law claim as a matter of law." (Threw MTD at 8) (citing *Sanguinetti v. Viewlogic Sys., Inc.*, No. C 95 2286 TEH, 1996 WL 33967, at *18 (N.D. Cal. Jan. 24, 1996)).[5] But Defendants have not provided any authority to support barring a finding of reasonable reliance as a matter of law in this case.

---

[4] In "omission cases," the court presumes reliance when the information withheld is material. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 (1972); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (per curiam). The *Affiliated Ute* presumption is confined to cases that primarily allege omissions. *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). Here, the Court finds that the allegations are primarily misrepresentation based and thus Plaintiff cannot rely on the presumption.

[5] Defendant Threw's reliance on *Sanguinetti* is misplaced. In *Sanguinetti*, the court relied on a D.C. Circuit case stating that "integration clauses would only bar fraud claims based on alleged promises *as to future behavior* not included in the final agreement." 1996 WL 33967 at *18 (citing *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995) (emphasis added)). Therefore, the court in *Sanguinetti* concluded that promises regarding the future behavior of the new owners that were not included in the final integrated agreement precluded reasonable reliance. *See id.* Further, the court in *Sanguinetti* highlighted that the D.C. Circuit did not "provide a per se bar." *Id.*

First, the Court must look to the language in the SPA. SPA Article III "Representations and Warranties of Seller" provides three pages of representations and contains an "as is" clause which states:

> EXCEPT AS SET FORTH ABOVE, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND RELATIVE TO THE COMPANY, ANY ASSETS OR LIABILITIES OF THE COMPANY, OR SELLER'S SHARES THEREIN. THIS AGREEMENT CONSTITUTES AN 'AS IS' SALE OF SHARES, OTHER THAN REPRESENTATIONS AND WARRANTIES AS LISTED HEREIN.

(SPA ¶ 3.17.)

The Ninth Circuit has not decided whether this type of "as is" or "no other representations" clause bars reasonable reliance as a matter of law. *See Merkamerica Inc. v. Glover*, 2019 WL 8989833, at *11 (C.D. Cal. 2019) (noting there did not appear to be any Ninth Circuit case law squarely on point). Defendants' reliance on *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1155, 1159–60 (9th Cir. 1996) is not persuasive.[6] (*See* Threw MTD at 8; TFA MTD at 17.) In *Paracor*, the Ninth Circuit did not create a per se rule. Instead, the Ninth Circuit reasoned that when there is a contractual representation that the plaintiff did not rely on any other person, that "goes far to defeat their . . . claims that they did precisely the opposite." *Id.* at 1159. Here, some of the representations in the SPA necessarily refer to information outside of the SPA provided by Defendants that Plaintiff contends was misleading. Thus, unlike *Paracor*, Plaintiff made no contractual representation that he would not rely on representations made by Defendants.

---

[6] Defendant Threw also cites *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 181 (3rd Cir. 2003) and claims that the court found that the "disclaimer bars securities fraud." (Threw MTD at 8.) That is incorrect. The Third Circuit "decline[d] to give controlling significance to the existence of a non-reliance clause in a vacuum." *AES Corp.*, 325 F.3d at 182. Further, other Circuits have found that a per se rule is not proper. *See Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 548 (6th Cir. 2012) ("This court has rejected a *per se* rule that non-reliance clauses foreclose the possibility of recovery"); *see also First Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d 835, 846 n.22 (11th Cir. 1993) (performing a contextual analysis).

Because there is no direct Ninth Circuit precedent, the Court turns to Section 29(a) of the Exchange Act. Section 29(a) provides that: "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of self-regulatory organization, shall be void." 15 U.S.C. § 78cc. The Court finds that allowing "as is" clauses to operate as a per-se bar for securities fraud claims would go against Section 29(a). *See Merkamerica Inc.*, 2019 WL 8989833 at *11 (stating that "courts in other jurisdictions interpreting Section 29(a) have held that 'non-reliance' clauses, where a party represents that it did not rely on statements outside the contract itself, cannot establish non-reliance as a matter of law").

Instead, whether an "as is" clause bars reasonable reliance is a "question of degree and context." *Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996). When an integrated agreement with an "as is" clause makes comprehensive and specific representations after negotiations by sophisticated parties, reasonable reliance on contradictory earlier representations is barred. *See id.* (finding that 14 pages of specific representations barred reasonable reliance on representations not made in those fourteen pages but reasoning that if there were but one vague seller's representation, the "no other representations" clause "might be toothless and run afoul of § 29(a)."). But when the agreement does not contain all the relevant information or other representations are consistent, reasonable reliance is not barred. *See, e.g., Buffin v. Community.com, Inc.*, No. 220CV07552SVWJPR, 2021 WL 4439224, at *3 (C.D. Cal. Aug. 6, 2021) (declining to conclude as a matter of law, at the motion to dismiss stage, that the non-reliance clause barred federal securities claims when the agreement did not contain all the relevant information).[7]

---

[7] Defendants make the same argument under California law. (*See* Threw MTD at 7–10; TFA MTD at 16–19.) The Court concludes that under California law a no reliance or "as is" clause does not bar reasonable reliance as a matter of law. *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 211 (2007) (finding the question of reasonable reliance was for the trier of fact when material representations were not contradicted by the offering documents that contained a no reliance clause). Defendants' reliance on *Bank of the West v. Valley Nat'l Bank of Ariz.*, 41 F.3d 471, 477–78 (9th Cir. 1994) is misplaced. (*See* Threw MTD at 7–8; TFA MTD at 17.) In *Bank of the West*, the Ninth Circuit found that under California law, any reliance by the plaintiff bank would have been "not justifiable" because the plaintiff promised to make decisions independently and without reliance on

Applying this standard to the SPA,[8] the Court finds Plaintiff alleges misrepresentations that are not comprehensively covered by the SPA, and thus the SPA does not bar reasonable reliance as a matter of law. For example, in Section 3.9 the SPA states, "[t]he financial and accounting books and records, Shares record books, minute books and other corporate records of Company are true and correct in all material respects." Because the SPA does not provide accounting books and records, the SPA does not bar reasonable reliance on financial materials provided outside the SPA. Overall, at this stage, the Court does not find the SPA bars reasonable reliance as a matter of law for all the alleged misrepresentations.

b. Parol Evidence Rule

"[P]arol evidence is admissible to show fraudulent inducement to enter a contract" even when the contract recites that "all conditions and representations are embodied therein." *Hardisty v. Moore*, 6 F. Supp. 3d 1044, 1054 (S.D. Cal. 2014) (citation omitted). Here, Plaintiff alleges "Threw misrepresented material facts regarding the Company to induce CCH into effectuating the Transaction." (Threw Opp'n at 7.) Thus, the parol evidence rule does not bar Plaintiff's Section 10(b) claim.[9]

/ / /

/ / /

---

another bank. Here, Plaintiff never promised to not rely on information provided by the Defendants. And *Bank of the West* did not change the general rule that boilerplate non-reliance clauses do not as a matter of law bar reasonable reliance. *See Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*, No. CV 11-303 PSG (PLAX), 2012 WL 12883616, at *22 (C.D. Cal. Feb. 23, 2012) ("*Valley National* does not preclude application of the general rule in California that a boilerplate clause 'stating that the parties relied only on representations contained in the contract does not bar, as a matter of law a claim for intentional misrepresentation' or fraudulent concealment.").

8 Defendant Threw alleges Plaintiff is a "sophisticated buyer represented by counsel." (Threw MTD at 10.) Plaintiff contests this characterization and alleges that Plaintiff was relying on TFA Defendants to conduct due diligence. (*See* ECF No. 23.)

9 An application of California law provides the same result. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1291 (9th Cir. 2006) ("Under California law, when fraud or illegality is alleged, the parol evidence rule does not apply") (citing Cal. Civ. Proc. Code § 1856(g)).

*3. Scienter*

The PSLRA requires the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The court must consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). An inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *See Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 324 (2007).

First, Plaintiff's conclusory allegation that "[a]t the time Defendants made the forgoing material misrepresentations, omissions, and/or false promises, Defendants knew them to be false, or recklessly disregarded their falsity" is not sufficient to allege scienter because it does not state facts with particularity. (Compl. ¶ 59.) Since this is the only allegation relating to scienter for Defendant TFA, the Court finds Plaintiff failed to allege scienter as to Defendant TFA. This provides another basis to **GRANT** the Motion to Dismiss the Section 10(b) claim with regards to Defendant TFA.

a. Defendant Olson

Plaintiff argues scienter is plausibly alleged for Defendant Olson based on the general allegations of Defendant Olson's participation in negotiations and drafting of the SPA as well as the email sent by Defendant Threw to Defendant Sells. (*See* ECF No. 23; Compl. ¶¶ 23–24, 35.) None of these allegations provide sufficient facts for a cogent inference of scienter as to Defendant Olson. The Court cannot extrapolate from the allegation that Defendant Threw sent an email to Defendant Sells that she read the email, told Defendant Olson about the content of the email, and Defendant Olson then shared in the decision to not inform Plaintiff of the business slowdown. The Court finds Plaintiff failed to allege scienter for Defendant Olson; this too provides another basis to **GRANT** the Motion to Dismiss the Section 10(b) claim with regards to Defendant Olson.

b. Defendant Threw

Plaintiff alleges scienter based on Defendant Threw's email admission "that the Company's prospects had changed and that he needed to communicate those facts to CCH" and his failure to do so. (Compl. ¶¶ 35, 71; Threw Opp'n at 10.) But the Complaint alleges Threw recognized the slowdown in business on June 17, 2024. (*See* Compl. ¶ 35.) And Plaintiff does not provide any explanation as to why this recognition of a slowdown would indicate fraudulent intent in previous pre-slowdown materials. An email stating that he should inform Plaintiff of negative information does not provide an inference of negative intent for earlier misrepresentations. Thus, the inference of scienter is strongest for the June Letter which was sent on the same day as Threw's email to Defendant Sells recognizing the shutdown. But Plaintiff has failed to allege an actionable misrepresentation or omission within the June Letter. Thus, the Court finds Plaintiff failed to allege scienter for Defendant Threw; this also provides another basis to **GRANT** the Motion to Dismiss the Section 10(b) claim with regards to Defendant Threw.

***C. California Corporations Code §§ 25401 and 25501***

Under California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Section 25501 establishes a private remedy for damages and rescission based on section 25401 liability. "Sections 25401 and 25501 impose liability only on the actual seller of the security." *Jackson*, 931 F. Supp. 2d at 1063.

*1. Defendant Threw*

Defendant Threw argues the Section 25501 claim should be dismissed for the same reasons Plaintiff's federal securities claim is deficient. (*See* Threw MTD at 23–24.) For the reasons previously explained, *see supra* Section IV(B), the Court **GRANTS** Defendant Threw's Motion to Dismiss the claims under Cal. Corp. Code §§ 25401 and 25501.

2. *TFA Defendants*

TFA Defendants argue "the Individual Defendants and TFA did not sell any securities to Plaintiff and were not in contractual privity with Plaintiff." (TFA MTD at 25.) Plaintiff appears to at least partially agree that the Complaint is deficient since it states that it will file an amended complaint that "will assert the third cause of action solely against Threw" and add "additional allegations" that "will detail how each of the Nebraska Defendants violated section 25504.1 by materially assisting Threw in violating sections 25401, 25501, and 25110 of the Corporations Code." (TFA Opp'n at 20.) Because the TFA Defendants did not sell the shares at issue to Plaintiff, the Court **GRANTS** TFA Defendants' Motion to Dismiss the claims under Cal. Corp. Code §§ 25401 and 25501.

***D. Section 20(a) of the Exchange Act of 1934***

The Court next considers whether Defendant Threw can be held joint and severally liable as a "controlling person" under Section 20(a) of the Exchange Act. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Plaintiff alleges Defendant Threw was a "controlling person" because "Threw had control over TJTC." (Compl. ¶ 65.) But TJTC is not alleged to be liable for any cause of action—Defendant Threw is. In effect, Plaintiff is arguing that Defendant Threw was in control of himself. (*See* Threw Opp'n at 23 ("Threw controlled the Company.").) Because Plaintiff fails to allege separate primary and secondary violations, Plaintiff has failed to plausibly allege a violation of Section 20(a). Thus, the Court **GRANTS** Defendant Threw's Motion to Dismiss the Section 20(a) claim.

/ / /

/ / /

### *E. California Corporations Code § 25110*

Under California Corporations Code § 25110, "[i]t is unlawful for any person to offer or sell in this state any security in an issuer transaction (other than in a transaction subject to Section 25120), whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113."

#### *1. Defendant Threw*

Defendant Threw argues the Complaint only contains "bare legal conclusions without supporting facts" and "the transaction likely qualifies for exemption under § 25102(f)." (Threw MTD at 24.) The Court disagrees. Unlike *Bowden v. Robinson*, 136 Cal. Rptr. 871, 874 (Cal. Ct. App. 1977), where the Plaintiff "did not allege an 'offer or sale,'" here, Plaintiff alleges the offer and sale of a security. (*See generally* Compl.) Further, Defendant Threw's argument that the sale "likely" qualifies for an exception is unpersuasive given the requirement in Section 25102(f)(2) that the purchaser has either "a preexisting personal or business relationship" with the issuer or "professional advisers who are unaffiliated with and who are not compensated by the issuer." Plaintiff alleges there is no preexisting relationship and that TFA was affiliated with and paid by Defendant Threw. (*See* Threw Opp'n at 24–25.) Thus, the Court **DENIES** Defendant Threw's Motion to Dismiss the Cal. Corp. Code § 25110 claim.

#### *2. Defendant TFA*

Defendant TFA argues "Section 25110 is inapplicable to TFA because TFA neither offered or sold securities to Plaintiff." (TFA MTD at 26.) Defendant TFA is correct; to recover under Section 25110 "a plaintiff must allege privity—i.e., that he purchased securities directly from the defendant." *Azad v. Jenner*, No. 2:24-CV-09768-SB-JC, 2025 WL 1718273, at *7 (C.D. Cal. May 9, 2025). Here, because Plaintiff purchased the shares from Defendant Threw, the Court **GRANTS** TFA Defendants' Motion to Dismiss the Cal. Corp. Code § 25110 cause of action.

/ / /

/ / /

### *F. California Corporations Code § 25210*

Plaintiff alleges violations of California Corporations Code § 25210 against all TFA Defendants. Under Section 25210, "no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity."[10]

TFA Defendants argue "Plaintiff has not alleged facts showing that TFA or Individual Defendants were a broker dealer or engaged in conduct Section 25210 prohibits." (TFA MTD at 28.) The Court disagrees. Broker-dealer "means any person engaged in the business of effecting transactions in securities in this state for the account of others or for that person's own account." Cal. Corp. Code § 25004. Further, "if an individual in the course of his business participates in negotiations that involve the purchase or sale of securities he is effecting or attempting to effect a transaction in such securities and is a broker-dealer." *Yokell v. Draper*, No. 18-CV-02124-JSC, 2018 WL 3417514, at *8 (N.D. Cal. July 13, 2018) (cleaned up) (citing *Nationwide Inv. Corp. v. California Funeral Serv., Inc.*, 40 Cal. App. 3d 494, 502 (Ct. App. 1974)).

Here, the SPA defines TFA's role as "the intermediary who acts on behalf of Seller in connection with this Agreement or the transactions contemplated hereby." (SPA ¶ 3.5.) Further, Plaintiff alleges TFA and Defendant Olson participated in the negotiations and drafting of the SPA and that Defendant Threw paid TFA a "substantial fee" for brokering the sale. (*See* Compl. ¶¶ 18, 23, 27.) Additionally, as undisputed by the TFA Defendants, Plaintiff alleges the TFA Defendants were unauthorized to act as California broker-dealers. (*See id.* ¶ 86.) Based on these allegations, Plaintiff plausibly alleges a violation of Section 25210 against Defendant TFA and Defendant Olson. *See Yokell*, 2018 WL 3417514, at *9 (finding allegations that the defendant negotiated the purchase or sale of the security in the

---

[10] "Rule 9(b) does not apply to this cause of action because it does not sound in fraud." *Garrison v. Ringgold*, No. 19CV244-GPC(RBB), 2019 WL 2089509, at *8 (S.D. Cal. May 13, 2019) (citing *Siegal v. Gamble*, Case No. 13 cv3570-RS, 2016 WL 3648503, at *6 (N.D. Cal. July 7, 2016)).

course of his business was sufficient to deny the motion to dismiss). The Court therefore **DENIES** TFA Defendants' Motion to Dismiss the Cal. Corp. Code § 25210 cause of action.

### *G. Intentional and Negligent Misrepresentation*

Under California law, the elements of intentional misrepresentation are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud; (4) justifiable reliance; and (5) resulting damages. *See Charnay v. Cobert*, 145 Cal. App. 4th 170, 184 (2006). In contrast, for "a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." *Id.* Defendants argue both misrepresentation claims fail for lack of falsity, scienter, and reasonable reliance. (*See* Threw MTD at 25; TFA MTD at 24.)

For the reasons previously explained, *see supra* Section IV(B), Plaintiff has failed to plausibly allege misrepresentation via a false representation or omission theory. Therefore, the Court **GRANTS** Defendant Threw and TFA Defendants' Motions to Dismiss the intentional and negligent misrepresentation claims.

### *H. California Business & Professions Code § 17200*

California's Unfair Competition Law ("UCL") does not extend to securities transactions. *See Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 786–90 (2004), *as modified on denial of reh'g* (Apr. 7, 2004); *see also Siegal v. Gamble*, No. 13-CV-03570-RS, 2016 WL 1085787, at *7 (N.D. Cal. Mar. 21, 2016) (finding UCL protections do not extend to securities transactions as long as *Bowen* endures). Plaintiff recognizes as much and states that it "intends to withdraw its Eighth Cause of Action against TFA for violating California's unfair competition law." (TFA Opp'n at 19.) Thus, the Court **GRANTS** TFA Defendants' Motion to Dismiss the UCL cause of action.

/ / /

/ / /

## CONCLUSION

In light of the foregoing, the Court **ORDERS** as follows:

1. **GRANTS** Defendant Threw's Motion to Dismiss **WITH LEAVE TO AMEND** as to:
    a. Section 10(b) of the Exchange Act
    b. Section 20(a) of the Exchange Act
    c. Cal. Corp. Code §§ 25401 and 25501
    d. Intentional Misrepresentation
    e. Negligent Misrepresentation
2. **DENIES** Defendant Threw's Motion to Dismiss as to:
    a. Cal. Corp. Code § 25110
3. **GRANTS** TFA Defendants' Motion to Dismiss **WITH LEAVE TO AMEND** as to:
    a. Defendants Sells and Kalagias for lack of personal jurisdiction
    b. Section 10(b) of the Exchange Act
    c. Cal. Corp. Code §§ 25401 and 25501
    d. Cal. Corp. Code § 25110
    e. Cal. Bus. & Prof. Code § 17200
    f. Intentional Misrepresentation
    g. Negligent Misrepresentation
4. **DENIES** TFA Defendants' Motion to Dismiss as to:
    a. Defendant Olson for lack of personal jurisdiction
    b. Cal. Corp. Code § 25210

Plaintiff **MAY FILE** an amended complaint curing the deficiencies outlined in this Order within twenty-one (21) days of the electronic docketing of this Order.

/ / /

/ / /

/ / /

**IT IS SO ORDERED.**

Dated: January 6, 2026

Honorable Todd W. Robinson
United States District Judge