Jessica Taran (SBN 224025)
John Kelley (SBN 194073)
NIESAR & VESTAL LLP
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone: (415) 882-5300
Facsimile: (415) 882-5400

*Attorneys for Plaintiff Coastal Communications Holdings*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL COMMUNICATIONS HOLDINGS,<br><br>                Plaintiff,<br><br>        vs.<br><br>TODD THREW; THE FIRM ADVISORS, LLC; JARED OLSON; CORTNEY SELLS; MAYKAYLA KALAGIAS; and DOES 1 – 10,<br><br>                Defendants. | Case No. 3:25-cv-01102-TWR (DEB)<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. **Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Securities Fraud);**<br>2. **Securities Fraud pursuant to Cal. Corp. Code §§ 25401 and 25501;**<br>3. **Sale of Securities in Violation of Cal. Corp. Code § 25110;**<br>4. **Sale of Securities in Violation of Cal. Corp. Code § 25210**<br>5. **Negligent Misrepresentation; and**<br>6. **Intentional Misrepresentation** |

SECOND AMENDED COMPLAINT

## SUMMARY OF THE ACTION

1. Plaintiff Coastal Communications Holdings ("Plaintiff" or "CCH") brings this action against Todd Threw ("Threw"), The Firm Advisors, LLC ("TFA"), Jared Olson ("Olson"), Cortney Sells ("Sells"), Maykayla Kalagias ("Kalagias"), and Does 1 through 10 (TFA, Threw, Olson, Sells, Kalagias, and Does collectively "Defendants") for violation of federal and California securities laws and related causes of action in connection with Threw's June 2024 sale to CCH, brokered by TFA, of 100,000 shares (the "Shares") of TJT Communications, Inc. dba Coastal Communications ("TJTC" or the "Company") common stock (the "Transaction").

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over Plaintiff's securities claims under 28 U.S.C. §1331 and under the Securities Exchange Act of 1934, 15 U.S.C. § 78 ("Exchange Act") and the rules and regulations promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

3. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and email.

4. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the claims under the Exchange Act.

5. Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) and (c). A substantial part of the events or acts giving rise to, and in furtherance of, the alleged wrongdoing occurred in this District. Indeed, many of the acts alleged herein, and the acts giving rise to Defendants' misconduct, occurred entirely, or in substantial part, in this District. Venue is also proper in this District pursuant to §27 of the Exchange Act because the acts or transactions constituting the violations occurred in this District.

1

SECOND AMENDED COMPLAINT

**PARTIES**

6.    CCH is a Wyoming corporation registered to do business in California. Michael Windsor ("Windsor"), an individual California resident, is CCH's chief executive officer, sole shareholder, and sole director.

7.    Defendant Threw is an individual California resident who previously owned TJTC. Threw was the founder, owner, and director of TJTC, and the person in charge of its key customer relationships.  TJTC depended heavily on Threw's personal relationships, reputation, and direct involvement in the day-to-day operations of the business.  Further, at all relevant times to the allegations herein, prior to Plaintiff's acquisition of TJTC, Threw had access to all of its financial, billing, accounting, personnel, vendor, and customer information.

8.    Defendant TFA is a Nebraska limited liability company with its principal office in Omaha, Nebraska. TFA is not authorized to conduct business in California. During negotiation of the Transaction (as defined below), TFA was a foreign entity unregistered in California and therefore unauthorized to conduct business in the State. As of the filing of this action, TFA remained unregistered and therefore ineligible to conduct business in California. Similarly, during negotiation of the Transaction and continuing to the present, TFA was not licensed to broker the purchase or sale of securities in California, nor was TFA authorized to broker the sale of a business in California.

9.    Defendant Olson is an individual Nebraska resident, TFA's in-house legal counsel, and an active member of the State Bar of California.

10.    Defendant Sells is an individual Nebraska resident and TFA's president.

11.    Defendant Kalagias is an individual Nebraska resident and TFA's brokerage principal.

12.    Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named as DOES 1 through 10, inclusive, and Plaintiff therefore sues these defendants by their fictitious names.  Plaintiff will seek

SECOND AMENDED COMPLAINT

leave to amend this complaint to allege the true names of these DOE defendants when they are identified.

13.    Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that damages as herein alleged were proximately caused by the acts of such defendants. Wherever the term "Defendants" is used in this complaint, it shall be defined to include the fictitiously named defendants as well. Plaintiff is informed and believes and, upon such information and belief, alleges that each of the Defendants was, at all times herein mentioned, acting in concert with, aiding and abetting, and acting in conspiracy with, each and every one of the remaining Defendants.

14.    At all relevant times, Defendants, and each of them, were the agents, representatives and/or employees of each other and were acting within the scope and purpose of their agency and employment, and each Defendant has ratified the acts of his, her or its agents, representatives and employees.

<strong>FACTUAL ALLEGATIONS</strong>

<em><strong>April 1, 2024: the Summary</strong></em>

15.    On or about April 1, 2024, Windsor saw on the website DealStream.com an advertisement entitled "Site Planning and Survey Firm: Niche in Telecom." Through DealStream.com, Windsor was directed to the TFA website, where he reviewed a listing entitled "*FOR SALE:* Site Planning and Survey Firm: Niche in Telecom with 21 on Staff" (the "Summary," a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference).

16.    The Summary, put together by TFA and posted on a TFA template with the TFA logo, identified a business located in San Diego, California, founded in 2008, and priced at $835,000. (Exhibit 1).

SECOND AMENDED COMPLAINT

17. Upon information and belief, based on statements later made to Windsor by Sells, Kalagias, and Threw, all of the information and representations set forth in the Summary was communicated to TFA by Threw.

18. TFA's website repeatedly touted TFA's business prowess and the ways in which TFA was well-positioned to broker business sale transactions. For example, in "Who We Are and What We Do," Sells stated,

> [M]aking the decision to buy or sell a business is always complex and always personal. That's why it helps to have a disciplined partner who can guide you through every step of the process – toward a successful, satisfying outcome. At the Firm Business Brokerage, we have the expertise, resources and successful track record to make your journey toward ownership both enjoyable and rewarding. As an entrepreneur myself, I understand the level of passion, hard work and commitment that goes in to owning a business. And as President, I'll personally see to your needs as we engineer your deal, working with our top-tier team to make sure you receive the personalized attention you deserve.

In "About Us," the TFA website stated, "For the selling client, it is essential that a professional, experienced broker be brought in to provide advice and guidance throughout the process." In "How We Work," the website stated, "The right deal is different for every business, so our team creates compelling Confidential Business Reviews that are tailored to each business and marketed specifically to attract the right buyer." Further, the website stated, "After an offer is accepted, our In-House Legal Counsel works closely with attorneys, CPA's and lending institutions to fine tune deal points over 30 to 60 days. During this time, we coordinate the due diligence, prep for a successful closing and facilitate a smooth transition."  In addition, the website stated, "The Firm Business Brokerage specializes in the sale and purchase of cash-flowing, successful businesses— exactly what buyers and lenders prefer. Anyone thinking about buying or selling a business should work with the brokerage that facilitated [m]ore than 150 closings in 18 industries."

19. After reviewing the Summary and other information contained on TFA's website, Windsor responded to a questionnaire on TFA's website and TFA subsequently set up an initial phone call in or about the first week of April, 2024. During that initial phone call, Windsor spoke with Sells and Kalagias regarding TJTC's financial health and sought information regarding Threw's reasoning for wanting to sell TJTC.

4

SECOND AMENDED COMPLAINT

20. Thereafter, Windsor spoke with Sells and Kalagias multiple times regarding TJTC and his interest in purchasing it. Sells and Kalagias were Windsor's primary points of contact. They assured him that TFA had verified the statements in the Summary.

### *False Statements in the Summary*

21. The false statements, made by Threw, and purportedly verified by the TFA Defendants, in the Summary, which was provided to Windsor on or about April 1, 2024, are set forth in the table below:

| | *Statement or Omission* | *Maker of the Statement / Individual Who Omitted the Information* | *Facts Illustrating Falsity (including when the facts were known)* | *Facts Illustrating Scienter* |
|---|---|---|---|---|
| A. | "Clients include Verizon, AT&T, Sprint" (Exhibit 1, left column, middle of page) | Threw and the TFA Defendants | In fact, AT&T was never a direct client of TJTC; Verizon was a client of TJTC in 2018; and Sprint was a client of TJTC in 2019. None of these entities were clients of TJTC in April 2024, when the representation was made in the Summary and reiterated during the call between Windsor, Threw, Sells and Kalagias during the April 10 telephone call. | Threw, as the founder, owner, director of TJTC, and the person in charge of most of its key customer relationships, with unfettered access to all of TJTC's books and record, had all the relevant information about TJTC's operations, including its active clients, purchase, orders, revenue, and profits. Moreover, when Verizon and Sprint were active clients of TJTC, Threw was in charge of those accounts. Threw knew at the time that the |

5

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | | | Summary was prepared by TFA on or about April 1, 2024, from information that he provided to TFA, and when he reiterated the veracity of the information in the Review during the call on April 10, 2024, that Verizon, AT&T and Sprint were not active clients of TJTC. Threw intentionally listed clients who were impressive but were not actual, active clients of TJTC with the intent to induce purchasers like Windsor to acquire TJTC.<br><br>Had Sells and Kalagias actually conducted an audit of TJTC's books as they represented to Windsor that they had, they would have seen that Verizon, Sprint, and AT&T were not active current clients of TJTC. Thus, Sells and Kalagias either lied to Windsor about conducting the audit or misrepresented their findings. |
| B. | "a 10% downpayment of $83,500 would return $125,195 in the first year after debt payments, | Threw, TFA Defendants | The projection was based on applying Q1 2025 purchase orders to the rest of the year; yet Threw had no basis for doing so, because, as | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with |

6

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| | which is a 171% return on investment"<br><br>(Exhibit 2, right column, top of page) | | Windsor discovered after the closing of the Transaction, there were no actual purchase orders of the same magnitude in queue. In fact, following the closing of the Transaction, Windsor has found no evidence in the Company's books and records of any discussions that Threw had with any customers regarding purchaser orders sufficient to support the representations that were made. | unfettered access to all of TJTC's books and records, had all the relevant information about TJTC's operations, including its active clients, purchase, orders, revenue, and profits. Threw knew at the time that the Summary was prepared by TFA on or about April 1, 2024, from information that he provided to TFA, that there were no actual or expected purchase orders that would warrant projecting Q1 2025 purchase orders to the rest of the year. (*See* ¶ 48)<br><br>Likewise, had Sells and Kalagias actually conducted an audit of TJTC's books as they represented to Windsor that they had, they would have seen that there were no actual or expected purchase orders for the rest of the 2025 that would warrant projecting Q1 2025 to the rest of the year. Thus, they either lied about conducting the audit or misrepresented their findings. |
| C. | "The owner is active in the business providing oversight and | Threw | Threw failed to include in the Summary that the vast majority of the purchase orders | Threw, as the founder, owner, and director of TJTC, and the person in charge |

7

SECOND AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| interfacing with the staff and clients." (Exhibit 1, left column, bottom of the page) | | originate with him, and therefore, he did much more than "provide oversight;" he was not only the owner and CEO but a project manager with respect to a majority of the customers. | of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Summary was prepared by TFA on or about April 1, 2024, from information that he provided to TFA, that his role as a project manager in charge of most client contracts was a material fact that should be disclosed to a prospective purchaser, but he intentionally withheld that fact, instead mischaracterizing his role as far less involved and easily replaceable. He did so with the intent to induce purchasers like Windsor to acquire TJTC. |
| D. "though [Threw] does feel that the current staff has been trained well enough to handle his responsibilities." (Exhibit 1, right column, middle of the page) | Threw, TFA Defendants | After Windsor acquired the Company, he learned from the employees that Threw did not allow them to get involved in his projects; systemically gatekept the other project managers from the clients that he originated for the Company; and did not properly train them to take over his role. After he acquired the Company, Windsor | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Summary was prepared by TFA on or about April 1, 2024, from information that he provided to TFA, that |

SECOND AMENDED COMPLAINT

| | | | observed that employees did not appear to have the authority, training, client relationships, or operational control necessary that would have been necessary to replace Threw as the business leader. After he acquired the Company, Windsor also observed that access to key systems, including payroll, QuickBooks, and/or banking/reporting information, was not meaningfully transitioned in a way that would allow an independent management team to operate smoothly. | he did not allow his employees to be involved in the client relationships that he originated, and that there was no trained internal executive or general manager who realistically could take over all of his responsibilities and relationships.  Threw made this misrepresentation with the intent to induce purchasers like Windsor to acquire TJTC.

Had Sells and Kalagias actually conducted an audit of TJTC's books as they represented to Windsor that they had, they would have seen that most of TJTC's purchase orders originated with Threw, which would have put them on notice that other project managers could not easily step into his role. |

### *April 2, 2024: The Confidential Business Review*

22.     On April 1, 2024, Windsor signed a confidentiality agreement, or an NDA, for TJTC. Jared Olson signed that document on behalf of TFA.

23.     Upon signing the NDA, on April 2, 2024, Windsor received from TFA, among other things, a more detailed document entitled "Confidential Business Review" (the "Review," a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by this reference).

9

SECOND AMENDED COMPLAINT

24.     The Review, like the Summary, was printed on TFA's template. The cover page included TFA's heading and logo, and the "Next Steps" outlined on the final page include a "Follow up call with [TFA's] Senior Associate."

25.     The Review identified the business on sale as "Coastal Communications" and identified Threw as the business owner.

26.     Upon information and belief, based on statements later made to Windsor by Sells, Kalagias, and Threw, all of the information and representations set forth in the Review was communicated to TFA by Threw, as the founder, owner, director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records.

27.     TFA brought Jared Olson onto the team for the TJTC matter when Windsor asked Sells and Kalagias whether he needed to retain his own attorney. Sells and Kalagias assured Windsor on multiple occasions that he did not need independent counsel, as TFA's services included legal counsel. Windsor, who was new to the process of buying a business, asked questions regarding TFA's ability to perform work on his behalf and Threw's behalf. The TFA team likened their role to that of a seller's agent in a real estate purchase: they ensure a smooth, quick process for all parties and are ultimately paid by the seller—in this case, Threw.

28.     Between April 1, 2024, when Windsor first initiated contact with TFA, and June 28, 2024, the date that Windsor and Threw executed the Stock Purchase Agreement (the "SPA") for the sale of the Company (as set forth in more detail below), Sells and Kalagias repeatedly represented to Windsor that TFA had performed a complete audit of TJTC, and verified the representations made in the Summary and the Review.

29.     When Windsor questioned the listed purchase price for TJTC, Sells and Kalagias reassured him that TFA had completed an in-house appraisal of the business and that the Company was valued at $835,000.

30.     Each time that Windsor spoke with Sells and Kalagias and they reassured him that TFA had verified the representations in the Summary and Review, Windsor understood Sells and

SECOND AMENDED COMPLAINT

Kalagias to be making those statements within the scope of their employment with TFA and on its behalf, as its agents.

31.    For the reasons set forth in the table below, statements made in the Review, which came from Threw, and were allegedly verified by Sells and Kalagias, were false, which Threw knew at the time that he had made them, and Sells and Kalagias knew if they had actually verified those statements as they had represented to Windsor.

### *False Statements in the Review*

32.    In addition to the statements set forth in the table above (¶ 21 (A)-(D)), which are included in the Review also, the false statements in the Review, provided to Windsor on April 2, 2024, by TFA based on information provided by Threw, and purportedly verified by TFA, are set forth in the table below:

| | *Statement or Omission* | *Maker of the Statement / Individual Who Omitted the Information* | *Facts Illustrating Falsity (including when the facts were known)* | *Facts Illustrating Scienter* |
|---|---|---|---|---|
| A. | "This company performs site planning and surveying for the telecom industry with clients such as Verizon, AT&T, Sprint, and Cox Communications" (Exhibit 2, p. 5 of the pdf) | Threw, and the TFA Defendants | As to Cox Communications, after Windsor acquired the Company, he learned that Cox Communications ceased being a client of the Company in 2016. | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA,  all the relevant information about TJTC's operations, including its active clients, purchase, orders, revenue, and profits.  He knew at the time that the Summary |

SECOND AMENDED COMPLAINT

| | | | | was prepared by TFA from information that he provided to TFA, and when he reiterated the veracity of the information in the Review during the call on April 2, 2024, that Verizon, AT&T and Sprint *were not active clients of TJTC*. Threw intentionally listed clients who were impressive, but were not actual, active clients of TJTC with the intent to induce purchasers like Windsor to acquire TJTC. Had Sells and Kalagias actually conducted an audit of TJTC's books as they represented to Windsor that they had, they would have seen that Cox Comms. had not been an active current client of TJTC since 2016; AT&T was never a direct client, Verizon had not been a client since 2018, and Sprint had not been a client since 2019. Thus, they either lied to Windsor about conducting the audit or misrepresented their findings. |
|---|---|---|---|---|
| B. | "They have built a tenured team of 21 employees, including 3 Project Managers" | Threw | By the close of escrow, nine critical employees listed in the Review had left their TJTC's employment. Moreover, as | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at |

12

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| | (Exhibit 2, p. 5 of the pdf) | | Windsor learned after he acquired the Company, in January 2024, before the Review was prepared, Carlos Gonzalez ("Gonzalez"), a draft manager, who Threw represented to Windsor could take over his role (*see* F, below) , advised Threw that he had had a major heart attack, had been hospitalized multiple times, and that the stress of taking on additional roles outside his agreed job title was contributing to his health concerns. Gonzalez specifically stated that his role had become skewed, that he was being given responsibilities he had not agreed to take on, and that he needed Todd to reduce those extra duties. He further advised Todd that if changes were not made within six months, Carlos might need to go on disability or take medical leave. | the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, that his employees whom he listed in the Review, including, without limitation, Gonzalez, may not stay on post-closing. Moreover, Windsor discovered after he acquired the Company that Threw had not even informed the employees about the sale of the business, further contributing to a mass exodus. |
| C. | "the owner, who is active in the | Threw; TFA Defendants | After Windsor acquired the Company, he | Threw, as the founder, owner, and director of TJTC, and the person |

13

SECOND AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| business, though he does feel that the current staff has been trained well enough to handle his responsibilities."<br><br>(Exhibit 2, p. 5 of the pdf) | | discovered that Threw's wife controlled important administrative functions, including payroll and access to business systems and had never trained anyone else in the company to take over those functions; access to key systems, including payroll, Quickbooks, and/or banking/reporting information was not meaningfully transitioned in a way that would allow an independent management team to operate smoothly; employees did not appear to have authority, training, client relationships, or operational control necessary to replate Threw as the business leader.<br><br>After Windsor acquired the Company, he also learned from Gonzalez about his disability concerns that he had shared with Threw and | in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, that he had not properly trained his employes to replace him and that he was the sole person at TJTC who had operational knowledge and system control. He also knew that Gonzalez was not interested in taking on new responsibilities. Yet, he identified him as a drafting manager who could replace Threw (*see* No. F, below).<br><br>TFA Defendants represented to Windsor during multiple telephone discussions in April 2024, that they had verified the representations in the Summary and Review. Had they spoken with any employees at TJTC, they would have known that none were trained or equipped to replace Threw, including Gonzalez. Thus, TFA Defendants either lied about conducting the audit or misrepresented their findings to Windsor. |

14

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | | that he did not know the financial position of the Company and had never been able to work with the other departments. | |
| D. | In response to the question "what percentage of sales are generated by the owner," Threw responded: "The name of the business itself is responsible. I have a good reputation after being in the industry for so long, but Coastal Communications is the important name." (Exhibit 2, p. 7 of the pdf) | Threw, TFA Defendants | Threw was the primary source of business; he was not only the CEO, he was a project manager that originated most of the purchase orders, based on his personal relationships. | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, that he was the primary source of business for the Company, which was a material fact that should have been disclosed to Windsor. Had TFA Defendants actually conduced the audit as they represented to Windsor, they would have seen from the purchase orders that the majority of the business originated with Threw, which would have indicated that it was not the name of the business that was responsible for business generation. Thus, TFA Defendants either lied about conducting the audit or misrepresented |

15

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | | | their findings to Windsor. |
| E. | "My wife handles the finances, but this is not a very active role – maybe 10 hours a month."<br><br>(Exhibit 2, p. 8 of the pdf) | Threw, TFA Defendants | After close of escrow, Windsor discovered that, in Q1 2024, Threw's wife earned a total of $23,800 in wages. If she worked 10 hours a month, that would that in Q1 2024, she was earning $793.33 per hour. Whether Jennie Threw was receiving $793.33 per hour in Q1 2024, the time period immediately prior to the preparation of the Review, or spending more time than 10 hours per month, the representation that "this is not a very active role" was false when made. | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, how much time his wife spent on the Company's finances and billing. In the Review, he intentionally minimized that role to induce purchasers like Windsor to acquire the Company.<br><br>TFA represented to Windsor that they had verified the statements in Review, yet, had they audited the Company's book including its payroll records, they would have seen that Jennie Threw's role was broader and more expensive to the Company than how it was characterized in the Review. Thus, TFA Defendants either lied about conducting the audit or misrepresented their findings to Windsor. |

16

SECOND AMENDED COMPLAINT

| | | | | |
|---|---|---|---|---|
| F. | In response to the question as to who could step into Threw's role, Threw responded: "A good one for this would be our drafting manager Carlos because he deals with so many clients." <br><br> (Exhibit 2, p. 8 of the pdf) | Threw, TFA Defendants | *See* B-C, above. | *See* B-C, above. |
| G. | The following clients, among others, are included as "Notable names" Cox Comms.; AT&T; Time Warner Cable; Zayo, Vinculums, Mobilitie, Ubiquity, and Extent. <br><br> (Exhibit 2, p. 12 of the pdf) | Threw; TFA Defendants | After commencing this action, Windsor discovered that Cox Comms. ceased being a client in 2016; AT&T was never a direct client; Time Warner Cable ceased being a client in 2014; Zayo ceased being a client in 2023; Vinculums ceased being a client in 2019; Mobilitie ceased being a client in 2023; Ubiquity ceased being a client in 2023, and Extenet ceased being a client in 2019. | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships (including with the aforementioned entities), with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, that a lot of these companies had not provided any business to TJTC for prolonged periods of time, (in case of Time Warner Cable, a decade). He intentionally included them to mislead prospective purchasers like Windsor about the viability of the Company. <br><br> Had the TFA Defendants actually conducted the audit that they represented to |

SECOND AMENDED COMPLAINT

| | | | | Windsor they had to verify the information in the Review, they would have seen from a review of Quickbooks, AR aging reports, bank deposits, customer ledgers and/or email/project records, that the entities listed as "Notable Clients" were not active current clients of TJTC at or near the time that the Review was prepared, and reference to these clients could not have supported the valuation of $835,000, without actual, current purchase orders. Thus, TFA Defendants either lied about conducting the audit or misrepresented their findings to Windsor. |
|---|---|---|---|---|
| H. | In response to the question regarding the recent hiring of new employees, Threw responded: "As we began bringing more people back to the office on a regular basis, some did not want to give up working from home and chose to take a position with less of a commute. Some had moved during the 2020-2022 further from the | Threw; TFA Defendants | After Winsor acquired the Company, he learned that Contrary to the statements in the Review, TJTC hired new employees prior to the Transaction because more tenured employees had resigned due to poor company culture and compensation. | Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew at the time that the Review was prepared by TFA on or about April 2, 2024, from information that he provided to TFA, that multiple employees had resigned and he certainly knew, given his role in the Company, why had they had done so. The company culture and |

18

SECOND AMENDED COMPLAINT

| | | | | employee satisfaction is an important factor considered by prospective purchasers like Windsor. Threw knew that, and intentionally failed to disclose the recent resignation of employees with the intent to induce purchasers like Windsor to acquire the Company. |
|---|---|---|---|---|
| office and realized that the commute was not desirable."<br><br>(Exhibit 2, page 14 of the pdf) | | | | Had TFA Defendants actually conduced the audit as they represented to Windsor, they would have seen personnel records reflecting resignations by multiple tenured employees. Thus, TFA Defendants either lied about conducting the audit or misrepresented their findings to Windsor. |

*__April 10, 2024: First Telephone Conversation between Windsor and Threw__*

33.    Windsor first spoke to Threw directly during a phone call on April 10, 2024, which Sells and Kalagias also attended. During that call, Threw, Sells, and Kalagias reiterated the information regarding TJTC's business operations and financial health previously detailed in the Summary and Review, and Sells and Kalagias vouched for its veracity. Windsor understood Sells and Kalagias' statements regarding the veracity of the representations in the Summary and Review to be have been made within the scope of their employment with TFA and on its behalf, as its agents.

34.    Threw also discussed his management style, TJTC's ability to operate without his involvement, and the possibility of someone like Windsor taking over the company. At that time,

SECOND AMENDED COMPLAINT

and at all times relevant to this action, Threw represented to Windsor that three of TJTC's managers were equipped to take over as CEO.

### *April 15, 2024: Contingent Offer*

35. After careful consideration of the Review and multiple conversations with Sells, Kalagias, and Threw, Windsor informed Sells and Kalagias that he was interested in buying TJTC. Windsor signed a contingent offer—printed on TFA's letterhead—on April 12, 2024. Threw signed that contingent offer on April 15, 2024.

36. Thereafter, TFA served as broker. Jared Olson participated in the negotiations between Windsor and Threw, which resulted in the Transaction.

37. Threw owned the Shares, which constituted all of the outstanding shares of TJTC, which had been doing business primarily in California.

38. In May 2024, in anticipation of the Transaction, Windsor formed CCH, a Wyoming corporation with it primary place of business in Carlsbad, California, to serve as purchaser of the Shares.

39. In early June 2024, CCH registered to do business in California.

40. Prior to effectuating the SPA, Windsor asked to speak with TJTC's employees and tour the office space. Sells and Kalagias dissuaded Windsor from this notion by claiming it was unnecessary and would cause unease or lead to turnover.

41. Olson, TFA's in-house counsel and a member of the State Bar of California since October 2021, facilitated the negotiations between Threw and Windsor and, together with Threw, drafted the documentation employed to complete the Transaction, including the SPA, which called for CCH to pay Threw $835,000 for the Shares.

42. In multiple interactions with him prior to the close of escrow, Threw, Sells, and Kalagias repeatedly reassured Windsor that the representations set forth in the Summary and the Review were accurate, and that TJTC was doing well.

43. During negotiation of the Transaction, Windsor believed that TFA was legally authorized to do business in California, in light of the facts that Threw, TJTC, the subject

20

SECOND AMENDED COMPLAINT

business, and Windsor were all located in California and TFA's in-house counsel Olson was admitted to practice law in the State.

44.     Plaintiff is informed and believes, and thereupon alleges, that Threw paid TFA a substantial fee (consisting of a percentage of the sale price) for brokering the Transaction.

### *The Balance Sheet*

45.     In June 2024, Threw's wife Jeanine, on behalf of Threw as TJTC's owner, and ostensibly, in her capacity as the person at TJTC who handled its accounting and billing, sent Windsor a final balance sheet as of December 31, 2023 (the "Balance Sheet"). (A true and accurate copy of the Balance Sheet is attached hereto as Exhibit 3-A and incorporated herein by this reference.)  The representations in the Balance Sheet can be attributed to Threw, as the Threw, as the founder, owner, and director of TJTC, and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records.

46.     On or about April 17, 2025, after Windsor acquired the Company, he was advised by his accounting team who compared the Balance Sheet with the version on Quickbooks for the same time period, that the Balance Sheet overstated Total Assets by $30,037: the Balance Sheet reflects Total Assets of $337,436.26, whereas the Quickbooks version reflects total assets of $307,399.26.  (A true and accurate copy of the Quickbooks version of the balance sheet for the time period ending December 31, 2023, is attached hereto as Exhibit 3-B, and incorporated herein by reference.)

### *June 17, 2024: June Letter*

47.     On June 17, 2024, Threw sent CCH a letter (the "June Letter") setting forth the status of several purportedly signed TJTC projects. (A true and correct copy of the June Letter is attached hereto as Exhibit 4 and incorporated herein by this reference.)

### *False Statements in the June Letter*

48.     The June Letter, authored by Threw, included the following false statements, which reiterated prior representations made by Threw to Windsor about expected purchase orders:

SECOND AMENDED COMPLAINT

| | Statement or Omission | Maker of the Statement / Individual Who Omitted the Information | Facts Illustrating Falsity (including when the facts were known) | Facts Illustrating Scienter |
|---|---|---|---|---|
| A. | Purchase Order with Advantage Engineering AT&T for 17 small cell designs, in the amount of $37,000 (expected by July 15, 2024).<br><br>(Exhibit 4, page 2 of the pdf) | Threw | This expected purchase order never materialized.  In fact, after Windsor acquired the Company, he had reviewed Threw's emails with existing clients, including Advantage Engineering AT&T and has not seen any  customer communications predating the June 2024 time period that confirms the negotiation of the purported purchase order. | At the time that made this representation in the June Letter, Threw was the only person at TJTC who would have known whether the purchase order with Advantage Engineering AT&T was actually in the works.  The absence of any evidence of any customer communications relating to this purported purchase order is indicative of Threw's intentional misrepresentation to Windsor made after Windsor already indicated his interest to purchase the Company. |
| B. | Crown Castle T-Mobile Small Cell for over 100 designs, in the amount exceeding $200,000 (expected in July 2024), characterized as "Projects on horizon" | Threw | After Windsor acquired the Company, in August 2024, he learned from the client representative at Crown Castle, Jesse A., that this purchase order never existed.  Moreover, Jesse A. indicated that no such purchase order had | At the time that Threw made this representation in the June Letter, he was the only person at TJTC who would have known whether the purchase order with Crown Castle was actually in the works.  The absence |

22

SECOND AMENDED COMPLAINT

| | | | | even been discussed with Threw. This was confirmed by the project managers at the Company. Further, Windsor has not seen any emails from Crown Castle representatives, nor any internal memoranda confirming or relating to this expected purchase order. | of any evidence of any customer communications relating to this purported purchase order, and the Crown Castle representation to Windsor after the sale went through that there were no discussions with Threw about this purchase order, is indicative of Threw's intentional misrepresentation to Windsor made to induce him to purchase the Company. |
|---|---|---|---|---|---|
| | (Exhibit 4, p. 2 of the pdf) | | | | |
| C. | Crown Castle Verizon Small Cell for over 100 designs, in the amount exceeding $200,000 (expected in September 2024), characterized as "Projects on horizon" | Threw | | *See* B, above. | *See* B, above. |

49.    Windsor relied on the misrepresentations set forth in the June Letter, because they created the illusion of a pipeline or expected revenue of at least $437,000, which made the acquisition of TJTC more attractive, but did not actually exist. These purported projects were key factors in Windsor's final decision to acquire TJTC by purchasing the Shares. Windsor would not have proceeded with the Transaction had he known that these three orders referenced in the June Letter were fabrications.

50.    The fact that the pipeline did not really exist is further evinced by the following communications from Threw made almost contemporaneously with the June Letter:

(a)    On June 17, 2024, Threw emailed Sells: "I probably need to have a meeting with Michael [Windsor] to share that work has significantly slowed over the past 4 weeks

23

SECOND AMENDED COMPLAINT

due to it being an election year, interest rates for construction and now the lay offs by one of our biggest clients. . . . Not a good time at the moment." Threw did not share this information with Windsor.

(b)   In addition, on June 18, 2024, Threw emailed Nick Patrick, one of TJTC's vendors, "Boy, it has slowed down for us the past month." Threw did not inform Windsor of this business slow down.

51.   If Threw had any reasonable basis to expect the three purchase orders totaling $437,00, listed in the June Letter, he would have no reason to lament the "slow down," because the gross sales figures would have been generally consistent with historical data. (See Exhibit 2, page 14).

### *June 28, 2024: The Closing of the Transaction and Subsequent Discoveries*

52.   The Transaction closed on June 28, 2024, and Threw and Windsor (on behalf of CCH) executed the SPA effective as of June 28, 2024.  (A true and accurate copy of the SPA is attached hereto as Exhibit 5 and incorporated herein by this reference.)

53.   Windsor would not have caused CCH to enter into the Transaction had he known the true state of the TJTC business.

54.   The misrepresentations set forth in paragraphs 21, 32, 45-46, and 48,  above induced Windsor to cause CCH to proceed with the Transaction. Windsor thought, based on these multiple material misrepresentations, that TJTC was in a solid financial position, growing and profitable.

55.   Had the Summary, the Review, the Balance Sheet, and the June Letter contained accurate representations regarding the business, Windsor would not have caused CCH to enter into the Transaction on the terms ultimately set forth in the Agreement.

56.   After the close of escrow, Windsor discovered that TJTC was not financially viable.

57.   From the closing of the Transaction to date, CCH has incurred at least $435,000 in unanticipated expenditures related to the dire state of the TJTC business.

24

SECOND AMENDED COMPLAINT

58.    Moreover, due to financial stresses and the need for Windsor to spend countless hours performing management and marketing tasks that were represented to be fully covered by personnel that had left TJTC before the closing of the Transaction, Windsor has been unable to (1) take compensation for his personal services in an amount even remotely approaching the fair value of those services and/or (2) pursue other business ventures.

**FIRST CAUSE OF ACTION**

**(Violations of Section 10(b) of the Exchange Act and SEC Rule l0b-5 (Securities Fraud)**

**(Against All Defendants)**

59.    Plaintiff incorporates herein by reference paragraphs 1 through 58 of this Complaint, as if restated in their entirety.

60.    Plaintiff is informed and believes, and upon that basis alleges, that by using means or instrumentalities of interstate commerce or of the mails, (i) Threw made material misrepresentations and/or omitted material facts necessary to make  his statements not misleading, in the Review, Summary, Balance Sheet, and June Letter, as set forth in paragraphs 21, 32, 45-46, and 48; and (ii) the TFA Defendants either (a) misrepresented to Windsor that they had audited TJTC's books and verified the representations made in the Summary and Review, or (b) audited TJTC's books and misrepresented their findings as to the representations set forth in paragraph 21 (A) – (D), and 32 (A), (C)-(H).

61.    The most egregious of the misrepresentations made by Threw, identified in paragraphs 21, 32, 45-46, and 48, is his reference to expected purchase orders totaling $437,000, which, as set forth above, did not exist. (*See* paragraph 48 (A) through (C).  Had TFA actually conducted the audit of TJTC's books and records that Sells and Kalagias represented to Windsor that it had, TFA Defendants would have known that those expected purchase orders were a fabrication, the valuation of TJTC at $835,000 was therefore inflated, and the statement that "a 10% downpayment of $83,500 would return $125,195 in the first year after debt payments, which is a 171% return on investment" that appears in the Summary and the Review (Exhibits 1 and 2) was not based on any actual existing purchase orders, and therefore false.

SECOND AMENDED COMPLAINT

62.    Defendants made the foregoing material misrepresentations, omissions, and/or false promises in connection with the sale of securities to Plaintiff, or an agreement to sell securities to Plaintiff, and induced Plaintiff to pay $835,000 for the purchase of the Shares.

63.    As set forth in the paragraphs 21, 32, 45-46, and 48, at the time Threw made each of the material misrepresentations, omissions, and/or false promises set forth in those above-cited paragraphs, Threw, as the founder, owner, director of TJTC and the person in charge of its key customer relationships, with unfettered access to all of TJTC's books and records, knew them to be false, or recklessly disregarded their falsity, and made them with the intention of inducting Plaintiff to purchase the Shares.

64.    As also set forth in paragraph 21, and 32, given that Sells and Kalagias, and Olson were each acting as agents of TFA, and Sells and Kalagias had informed Windsor on several occasions during the time period between April 1, 2024, and June 28, 2024, that TFA audited and verified the information in the Summary and Review, TFA Defendants, and each of them made each of the material misrepresentations, omissions, and/or false promises set forth in those above-cited paragraphs, that each knew to be false, or recklessly disregarded their falsity, and made them with the intention of inducting Plaintiff to purchase the Shares.

65.    To the extent that TFA did not actually conduct an audit of TJTC's books and records to verify the statements in the Summary and Review, Sells and Kalagias' statements made to Windsor during the time period between April 1, 2024 and June 28, 2024, prior to the closing of the Transaction advising him that TFA had done so, are the misrepresentations that form the basis of this cause of action against TFA.

66.    Plaintiff justifiably relied upon each of the Defendants' material misrepresentations, omissions, and/or false promises, and their totality, when it purchased the Shares for $ 835,000.

67.    Defendants' conduct as described above amounts to violations of Section 10(b) of the Exchange Act and Rule l0b-5 thereunder.

26

SECOND AMENDED COMPLAINT

68.     Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for (i) rescission of the SPA and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### (Securities Fraud pursuant to Cal. Corp. Code §§ 25401 and 25501)

### (Against Defendant Threw)

69.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 68 as though fully set forth herein.

70.     Threw sold Plaintiff shares of TJTC, which are securities under California law. (Cal. Corp. Code §25019.)

71.     The documents including the Summary, the Review, Balance Sheet, and the June Letter (together, the "Documents") contained untrue statements of material fact and/or omitted or failed to state material facts necessary in order to make the Documents, in light of the circumstances under which the statements contained therein were made, not misleading, as set forth in paragraphs 21, 32, 45-46, and 48.

72.     The most egregious of the misrepresentations made by Threw, identified in paragraphs 21, 32, 45-46, and 48, is his reference to expected purchase orders totaling $437,000, which, as set forth above, did not exist. (See paragraph 48 (A) through (C).  That misrepresentation resulted in an inflated valuation of TJTC at $835,000, and rendered false the statement that "a 10% downpayment of $83,500 would return $125,195 in the first year after debt payments, which is a 171% return on investment" that appears in the Summary and the Review (Exhibits 1 and 2) insofar as it was not based on any actual existing purchase orders.

SECOND AMENDED COMPLAINT

73. As set forth above, Threw, who, in his capacity as the owner, CEO, and the project manager generating the majority of the business for the Company, was the sole person at TJTC who had all the knowledge and information relevant to a prospective purchaser's decision whether to buy the Company, made the misrepresentations knowing they contained untrue statements of material fact and omitted or failed to state material facts.

74. Threw offered and sold TJTC securities to CCH in violation of California Corporations Code section 25401.

75. Had the Documents contained true and complete statements of material fact, and not failed to state information necessary to make the statements accurate instead of misleading, CCH would not have agreed to purchase TJTC securities.

76. Likewise, had Threw provided CCH with all of the material information CCH should have received regarding the true value of TJTC securities, CCH would not have purchased those securities.

77. CCH is informed and believe that the TJTC securities it purchased are presently worth no more than $477,000.

78. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Threw for (i) rescission of the SPA and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**THIRD CAUSE OF ACTION**

**(Sale of Securities in Violation of Cal. Corp. Code § 25110)**

**(Against Defendant Threw)**

79. Plaintiff incorporates by reference the allegations of paragraphs 1 through 78 as though fully set forth herein.

28

SECOND AMENDED COMPLAINT

80. Threw sold Plaintiff shares of TJTC, which are securities under California law. (Cal. Corp. Code §25019.)

81. Threw's offering in the Agreement was not qualified pursuant to California Corporations Code section 25110 et seq.

82. CCH is informed and believes that neither Threw nor TFA filed a Notice of Transaction in connection with the Agreement pursuant to California Corporations Code section 25102(f).

83. Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for rescission of the SPA and refund on of the consideration paid by CCH for the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**FOURTH CAUSE OF ACTION**

**(Sale of Securities in Violation of Cal. Corp. Code § 25210)[1]**

**(Against the TFA Defendants)**

84. Plaintiff incorporates by reference the allegations of paragraphs 1 through 83, as though fully set forth herein.

85. Upon information and belief, at the time of CCH's purchase of TJTC securities, none of the TFA-affiliated Defendants either obtained from any California securities administrator certificates authorizing them to act as securities broker-dealers, nor were exempted from doing so under Cal. Corp. Code § 25200 et seq.

86. Accordingly, all sales to CCH brokered by TFA and such other unlicensed

87. defendants were unauthorized and in violation of California Corporations Code section 25210.

---

[1] Plaintiff respectfully notes that the prior iteration of the Amended Complaint inadvertently excluded this cause of action even though by its Order dated January 6, 2026 [ECF 24], the Court denied TFA Defendants' motion to dismiss this cause of action.

SECOND AMENDED COMPLAINT

88.     Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Defendants for rescission of the Agreement and restitution of the consideration paid by CCH for the Shares, plus interest, and treble damages.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### (Against Defendants Threw and TFA)

89.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 88 as though fully set forth herein.

90.     Plaintiff is informed and believes, and upon that basis alleges, that: (1) Defendants Threw and TFA made representations to Windsor regarding the TJTC business (*see supra*, ¶¶ 21, 32, 45-46 and 48, as to Threw, and ¶¶ 21 (A) – (D), and 33 (A), (C)-(H), as to TFA); (2) those statements were not, in fact, true; (3) Threw and TFA had no reasonable grounds upon which to believe those statements were true when they made those statements to Windsor given that (a) Threw, in his capacity as the owner, CEO, and the project manager generating the majority of the business for the Company, was the sole person at TJTC who had all the knowledge and information  relevant to a prospective purchaser's decision whether to buy the Company, and (b) TFA agents, Sells and Kalagias – acting in their capacity as agents of TFA -- assured Windsor on various occasions between April 1, 2024 and June 28, 2024, after the Summary and Review (containing some of the misrepresentations) were provided to Windsor -- that they audited and verified the information contained therein; (4) Threw and TFA intended that Windsor rely on those representations; (5) Windsor reasonably relied on those representations; and (6) CCH was harmed as a result of Windsor's reliance on Threw's and TFA's  representations.

91.     Threw and TFA  made material misrepresentations and/or omitted material facts necessary to make their statements not misleading, including, but not limited to, the misrepresentations set forth in paragraphs 21, 32, 45-46, and 48.

SECOND AMENDED COMPLAINT

92.    The most egregious of the misrepresentations made by Threw, identified in paragraphs 21, 32, 45-46, and 48, is his reference to expected purchase orders totaling $437,000, which, as set forth above, did not exist. (*See* paragraph 48 (A) through (C).  Had TFA actually conducted the audit of TJTC's books and records that Sells and Kalagias represented to Windsor that it had, it would have known that those expected purchase orders were a fabrication, the valuation of TJTC at $835,000 was therefore inflated, and the statement that "a 10% downpayment of $83,500 would return $125,195 in the first year after debt payments, which is a 171% return on investment" that appears in the Summary and the Review (Exhibits 1 and 2) was not based on any actual existing purchase orders, and therefore false.

93.    To the extent that TFA did not actually conduct an audit of TJTC's books and records to verify the statements in the Summary and Review, Sells and Kalagias' statements made to Windsor during the time period between April 1, 2024 and June 28, 2024, prior to the closing of the Transaction advising him that TFA had done so, are the misrepresentations that form the basis of this cause of action against TFA.

94.    Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Threw and TFA for (i) rescission of the SPA and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**SIXTH CAUSE OF ACTION**

**(Intentional Misrepresentation)**

**(Against Defendants Threw and TFA)**

95.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 94 as though fully set forth herein.

31

SECOND AMENDED COMPLAINT

96.    Plaintiff is informed and believes, and upon that basis alleges, that: (1) defendant Threw and TFA ((see supra, ¶¶ 21, 32, 45-46 and 48, as to Threw, and ¶¶ 21 (A) – (D), and 33 (A), (C)-(H), as to TFA) made representations to Plaintiff that certain statements regarding the TJTC business were true; (2) those statements were false; (3) Defendants knew the statements were false when they made them, or they made those representations recklessly and without regard for their truth given that (a) Threw, in his capacity as the owner, CEO, and the project manager generating the majority of the business for the Company, was the sole person at TJTC who had all the knowledge and information  relevant to a prospective purchaser's decision whether to buy the Company, and (b) TFA agents, Sells and Kalagias – acting in their capacity as agents of TFA -- assured Windsor on various occasions between April 1, 2024 and June 28, 2024, after the Summary and Review (containing some of the misrepresentations) were provided to Windsor -- that they audited and verified the information contained therein; (4) Threw and TFA intended that Windsor rely on those representations; (5) Windsor did reasonably rely on those representations; and (6) CCH was harmed as a result of Windsor's reliance on Threw's and TFA's  representations.

97.    Defendants made intentional material misrepresentations and/or intentionally omitted material facts necessary to make their statements not misleading, including, but not limited to, the misrepresentations set forth in paragraphs 21, 32, 45-46, and 48.

98.    The most egregious of the misrepresentations made by Threw, identified in paragraphs 21, 32, 45-46, and 48, is his reference to expected purchase orders totaling $437,000, which, as set forth above, did not exist. (*See* paragraph 48 (A) through (C).  Had TFA actually conducted the audit of TJTC's books and records that Sells and Kalagias represented to Windsor that it had, it would have known that those expected purchase orders were a fabrication, the valuation of TJTC at $835,000 was therefore inflated, and the statement that "a 10% downpayment of $83,500 would return $125,195 in the first year after debt payments, which is a 171% return on investment" that appears in the Summary and the Review (Exhibits 1 and 2) was not based on any actual existing purchase orders, and therefore false.

32

SECOND AMENDED COMPLAINT

99.    To the extent that TFA did not actually conduct an audit of TJTC's books and records to verify the statements in the Summary and Review, Sells and Kalagias' statements made to Windsor during the time period between April 1, 2024 and June 28, 2024, prior to the closing of the Transaction advising him that TFA had done so, are the misrepresentations that form the basis of this cause of action against TFA.

100.    Plaintiff therefore respectfully requests that the Court enter a finding in CCH's favor and against Threw and TFA for (i) rescission of the SPA and restitution of the consideration paid by CCH for the Shares, plus interest; or, in the alternative, (ii) compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal counsel of business since the acquisition of the Shares, plus interest.

101.    In addition, given that Threw and TFA's conduct amounts to oppression, fraud, and malice, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

On the **First Cause of Action**:

(1)    For rescission of the SPA and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares.

(2)    For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)    For costs of suit incurred herein; and

(4)    For such other and further relief as the Court deems just and proper.

33

SECOND AMENDED COMPLAINT

On the **Second Cause of Action**:

(1)     For rescission of the SPA and restitution of the consideration paid by CCH for the Shares;

(2)     For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)     For costs of suit incurred herein;

(4)     For reasonable attorneys' fees, pursuant to California Corporations Code section 25501; and

(5)     For such other and further relief as the Court deems just and proper.

On the **Third Cause of Action**:

(1)     For rescission of the SPA and restitution of the consideration paid by CCH for the Shares;

(2)     For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)     For costs of suit incurred herein; and

(4)     For such other and further relief as the Court deems just and proper.

On the **Fourth Cause of Action**:

(1)     For rescission of the SPA and restitution of the consideration paid by CCH for the Shares;

(2)     For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)     For reasonable attorneys' fees, pursuant to California Civil Procedure Code section 1029.8(a);

(4)     For costs of suit incurred herein;

(5)     for treble damages, pursuant to California Civil Procedure Code section 1029.8(a); and

(6)     For such other and further relief as the Court deems just and proper.

34

SECOND AMENDED COMPLAINT

On the **Fifth Cause of Action**:

(1)    For rescission of the SPA and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares;

(2)    For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)     For costs of suit incurred herein; and

(4)    For such other and further relief as the Court deems just and proper.

On the **Sixth Cause of Action**:

(1)    For rescission of the SPA and restitution of the consideration paid by CCH for the Shares; or, in the alternative, for compensatory damages, in an amount to be proven at trial, but no less than the diminution in value of the Shares since the acquisition by CCH, and expenditures incurred by CCH outside the normal course of business since the acquisition of the Shares;

(2)    For prejudgment interest as provided by law, running from the date of CCH's investment;

(3)    For punitive and exemplary damages;

(4)    For costs of suit incurred herein; and

(5)    For such other and further relief as the Court deems just and proper.

SECOND AMENDED COMPLAINT

DATED:  May 29, 2026                          NIESAR & VESTAL LLP


                                              /s/  Jessica Taran

                                              _____

                                              Jessica Taran

                                              Attorneys for Plaintiff



                          **DEMAND FOR JURY TRIAL**

        Plaintiff demands a jury trial on all issues triable by a jury.


DATED:  May 29, 2026                           NIESAR & VESTAL LLP


                                              /s/  Jessica Taran

                                              _____

                                              Jessica Taran

                                              Attorneys for Plaintiff

36

SECOND AMENDED COMPLAINT